STATE OF NORTH CAROLINA v. CHRISTOPHER EDWARD GOSS

No. 316A05

(Filed 9 November 2007)

### 1. Jury— capital selection—reopening of voir dire—incorrect statements

The trial court did not abuse its discretion in a capital first-degree murder case by reopening the voir dire of two prospective jurors based upon the trial court's finding that both had provided incorrect statements in response to the State's initial voir dire questioning when it was discovered before the jury was impaneled that two jurors had relatives who had been defendants in criminal cases, although neither had indicated this when asked initially, because: (1) the record reveals that the actual question asked by the State was an inquiry into any close friends or relatives; (2) defendant cites no case, statute, or any other authority that suggests the term "relative" in its well-accepted usage does not apply to an individual's biological father even if the child had been adopted; and (3) it would have also been within the trial court's discretion to interpret the State's question as an inquiry into anyone connected to the prospective jurors "by blood or affinity" so that "relatives" would include "distant" cousins. N.C.G.S. § 15A-1214(g).

### 2. Constitutional Law— right to counsel—no right to consult attorney during psychiatric evaluation

The trial court did not err in a capital first-degree murder case by barring defendant from consulting with counsel during his mid-trial psychiatric evaluation by the State's mental health expert that resulted from a breakdown of communication between prosecutors and defense counsel during pretrial preparation, because: (1) in an effort to remedy the situation in a manner that would be fair to both parties and to spare defendant the harsh consequence of having the testimony of his own mental health expert and the only evidence in support of his theory of defense barred, the trial court ordered the mid-trial examination that is the subject of defendant's assignment of error; and (2) defendant's argument that the trial court's order deprived him of his right to counsel was not preserved as a consequence of his failure to timely object at trial, and defendant also failed to assign plain error to the trial court's order.

**3. Constitutional Law— effective assistance of counsel— admission of client's guilt without obtaining permission— lapsus linguae**

The trial court did not violate defendant's right to effective assistance of counsel in a capital first-degree murder case by allowing defense counsel to state during closing arguments that defendant's statement alone guarantees he'll serve a substantial amount of time in prison and face the terrible consequences of a first-degree murder conviction, because: (1) a review of the record in the instant case demonstrated that defense counsel's pertinent statement did not amount to *Harbison* error; (2) when this statement is viewed in the context of defense counsel's entire closing argument, it appears that the reference to first-degree murder was accidental and went unnoticed; (3) the only issue contested at defendant's trial was whether he committed first-degree or second-degree murder, and trial counsel's entire closing argument was directed toward undercutting the two theories of first-degree murder advanced by the State; and (4) the statement in question did not amount to a concession of defendant's guilt of first-degree murder, and absent such a concession, defendant failed to carry his burden of showing that his trial counsel's performance fell below an objective standard of reasonableness.

**4. Criminal Law— prosecutor's argument—consciousness of guilt**

The trial court did not abuse its discretion in a capital first-degree murder case by failing to intervene ex mero motu during the State's closing argument that defendant assaulted another inmate while in jail in retaliation for reporting to authorities an incriminating statement defendant had made to him in regard to the murder in this case, because: (1) even assuming arguendo that the closing argument was grossly improper, any prejudice to defendant was cured by the trial court's instructions to the jury following closing arguments stating that the State's evidence regarding the jail inmate could only be considered for the limited purposes of showing defendant's consciousness of guilt and as a basis for expert opinion regarding defendant's mental state at the time of the alleged murder; and (2) defendant cannot show that the trial court failed to correct any prejudice that might have resulted from the State's closing argument.

### 5. Sentencing— death penalty—proportionality

The trial court did not err in a first-degree murder case by sentencing defendant to the death penalty, because: (1) two aggravating circumstances were found including the N.C.G.S. § 15A-2000(e)(4) aggravating circumstance that defendant committed the murder for the purpose of avoiding a lawful arrest, and the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance that the murder was especially heinous, atrocious, or cruel; (2) defendant needlessly stabbed the victim over fifty times with at least two different knives, pausing several times between series of stabs, thereby prolonging the victim's suffering; (3) defendant left the victim's three-year-old grandson alone in the residence after the murder, making it highly probable that the child would awaken to discover his grandmother dead on the living room floor, half naked in a pool of blood with knives protruding from her body; (4) defendant was the only assailant, was twenty-eight-years old at the time of the offense, sought no medical treatment for the victim, failed to show any immediate remorse for the murder, and instead expended considerable time and effort toward concealing his identity and misleading investigators; and (5) defendant did not readily and immediately admit his guilt, but instead did so only after becoming the primary focus of the murder investigation and being ordered to submit hair and blood samples that he knew would implicate him in the murder.

### 6. Appeal and Error— preservation of issues—failure to argue

The remaining assignments of error presented by defendant and not set out or argued in his brief are deemed abandoned under N.C. R. App. P. 28(b)(6).

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge Richard L. Doughton on 8 February 2005 in Superior Court, Ashe County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 11 September 2007.

*Roy Cooper, Attorney General, by Barry S. McNeill, Special Deputy Attorney General, for the State.*

*Ann B. Petersen for defendant-appellant.*

STATE v. GOSS

[361 N.C. 610 (2007)]

BRADY, Justice.

On 22 September 2003, defendant Christopher Edward Goss stabbed his neighbor Deborah Sturgill Veler to death in her home, inflicting over fifty sharp-force wounds to her back, neck, face, hands, and arms using knives from her kitchen. Defendant was convicted of first-degree murder, and a jury returned a binding recommendation that defendant be sentenced to death. On 8 February 2005, the trial court entered judgment sentencing defendant accordingly.

## BACKGROUND

At trial, Kenneth Courtner testified that at approximately noon on Sunday, 21 September 2003, he took his three-year-old son Devin, the grandson of Deborah Sturgill Veler (the victim), to stay overnight with his grandmother at her residence in Jefferson, North Carolina. Denise Veler Courtner, Devin's mother and the victim's daughter, had made arrangements to pick up Devin at approximately 6:30 a.m. the next morning, 22 September 2003, at a church parking lot adjacent to State Highway 221.

Nancy Kerley, Devin's paternal grandmother, testified that sometime after 6:30 a.m. on 22 September 2003 she was driving to work when she passed the church parking lot where the victim had arranged to meet Ms. Courtner. Ms. Kerley observed Ms. Courtner sitting in a truck in the parking lot and stopped to speak with her, whereupon Ms. Kerley learned that Ms. Courtner had been waiting for her mother for approximately one hour. Eventually, Ms. Kerley decided to drive to the victim's residence, and Ms. Courtner contacted law enforcement to request that an officer be sent to check on her mother.

Ashe County Deputy Sheriff Rob Powers was dispatched to the victim's residence in response to Ms. Courtner's request. When Deputy Powers arrived at the residence at approximately 9:15 a.m., he observed Ms. Kerley knocking at the front door of the residence. A neighbor, Rita Wagoner Jordan, testified that she arrived at the scene at about the same time as Deputy Powers, having overheard the dispatch on her police radio scanner. After Deputy Powers began knocking, he eventually observed Devin inside the residence. Ms. Kerley and Deputy Powers were able to instruct Devin to open the front door, at which time he jumped into the arms of Ms. Jordan, appearing to be "hungry, tired, sleepy, [and] in shock." Deputy Powers then entered the residence and found the victim's body on the living room floor.

## I. STATE'S INVESTIGATION

A subsequent investigation of the crime scene by law enforcement officials uncovered evidence that the murder may have occurred during the commission of a burglary and a sexual assault on the victim. There was also a substantial amount of blood discovered at the residence, which later testing indicated came from two individuals. Investigators performed a neighborhood canvas on 22 September 2003 and again on 24 September 2003. On both dates, an investigator went to the residence of Jim and Anna Lee Goss, defendant's parents, where defendant resided at the time. On each occasion, defendant was interviewed and denied having left his parents' house at any time during the night of the victim's murder.

On 12 October 2003, defendant was booked on unrelated charges by the Jefferson Police Department. During this process, acting Police Chief David Larry Neaves observed a cut on defendant's arm that caused him to suspect defendant may have been involved in the murder. The same evening, while defendant was still in custody, Chief Neaves and North Carolina State Bureau of Investigation Special Agent Steve Wilson questioned defendant about the murder. Defendant waived his *Miranda* rights and agreed to answer their questions. During the interrogation, defendant gave an account of his whereabouts on 21 and 22 September 2003 that was inconsistent with statements he had provided previously. However, defendant again denied any involvement in the murder and explained that the cut on his arm resulted from a piece of broken glass falling on him while he was cleaning the garage windows at his parents' house.

On 24 October 2003, investigators served a warrant on defendant for the seizure of hair and blood samples. After defendant provided these samples and was transported back to the Ashe County Jail, defendant asked to speak with Chief Neaves and Special Agent Wilson and was taken to an interrogation room, where he waived his *Miranda* rights again. Special Agent Wilson then asked defendant what he wanted to share, and defendant immediately responded that ·he had "killed" the victim.

## II. DEFENDANT'S CONFESSION

Thereafter, defendant provided a statement that contained, *inter alia,* the following facts: At about 3:00 p.m. on Sunday, 21 September 2003, defendant walked from his parents' house to a 7-Eleven convenience store in West Jefferson to purchase beer, carrying with him a

duffle bag. As defendant was returning from the store, the victim stopped her sport utility vehicle (SUV) and offered him a ride. Defendant accepted and got into the front passenger seat. Devin was also in the vehicle. While on their way, the victim asked defendant whether he knew her daughter, Denise, and he replied that he did. When they arrived at the victim's residence, she asked defendant whether he wanted to return later that night, and he indicated that he would do so.

Defendant returned to his parents' house, entering through the basement door, and consumed eight or nine of the beers he had purchased. At approximately 11:00 p.m., he returned to the victim's residence. When he arrived, he knocked on the front door and was invited in by the victim, who led defendant to a couch in the living room. Devin was apparently asleep in a nearby bedroom at the time. Defendant and the victim then engaged in some casual conversation until the victim ultimately returned to the subject of her daughter Denise. She asked defendant whether he had fathered one of Denise's children, and he denied the accusation. She further inquired about a party that defendant and Denise had attended years earlier and said Denise claimed that defendant had raped her at the party. Defendant stood up and stated his intention to leave, but the victim pointed at him and told him, "You're not going nowhere."

As the victim was pointing at defendant, she poked her finger into his forehead. Defendant reacted to this by striking her on the nose with the palm of his hand. The victim said she intended to call the police and rushed into her bedroom. Although she attempted to close the door behind her, defendant followed her, grabbed her hair, and threw her onto the bed. A struggle ensued on the bed as defendant hit the victim "a few times." Defendant released the victim and she started to run, but he grabbed her and pushed her down. She then escaped his grasp, but again he was able to wrestle her down to the floor. Defendant inquired as to whether the victim still intended to call the police, and she replied, "Yes." Although defendant pleaded with her to calm down, she cursed at him and told him he was "going to pay for this." Defendant then struck the victim several times in the face and the back of her head until she stopped moving. He took a break to smoke a cigarette and think about what he was doing.

Defendant left the victim's residence and returned to his parents' house, where he collected a change of clothes, a hammer, and some duct tape, placing these items in his duffle bag. He walked back to

the victim's residence and pushed open the locked rear double doors with the intention "to make it look like a robbery or breaking and entering" and with the hope that the victim would forget who had assaulted her. He went into the kitchen and began to ransack it, but as he did so the victim raised her head and saw him. Defendant got on top of the victim and told her to calm down and not to call the police. When she indicated that she would not follow his instructions, defendant bound her hands behind her back using his duct tape and also bound her feet together. He then struck her repeatedly until she once again stopped moving.

Shortly after defendant resumed ransacking the house, the victim regained consciousness and started to scream. Defendant asked her to be quiet and to remember that she did not know who he was. The victim stated that defendant was "going to jail." Defendant then walked to the kitchen and obtained a ten-inch long knife belonging to the victim. He returned to the victim, straddled her, and began to stab her in the back, "not kind of hard at first, maybe four times." He paused a moment and then stabbed her five more times in the back, harder and deeper than before. The victim was silent and did not struggle.

Defendant at this point asked aloud, "What the hell am I doing?" He laid the knife on the victim's back and returned to the kitchen, but when he heard her mumble something, he obtained a second, longer knife. Defendant straddled the victim again and stabbed her five to eight more times on the left side of her back. He then left the second knife in her body, stood up and saw that the victim was still breathing though she remained silent, and used another knife to slit her throat "to make sure she died."

Defendant soon realized he had cut himself on the left forearm and that he was bleeding "quite a bit." He removed his shirt and wrapped it around his arm in an attempt to stop the bleeding. Then he went to the bedroom to check on Devin. While there, defendant observed he was still bleeding and that some of this blood had gotten onto the bed. After "just walking around thinking what to do," defendant returned to the victim and observed that she was no longer breathing. He noted the time on a nearby clock was 3:45 a.m.

In his statement, defendant further described the actions he took after the murder. He first changed out of his clothes and put on the clothes he had obtained from his parents' house, placing the old clothes in his duffle bag. He then walked back to his parents'

house, cleaned some blood from his chest and shoulder, and bandaged the cut on his left forearm. For the third time, he returned to the victim's residence, again through the rear double doors, but this time he was wearing black leather gloves. He took several actions "just to make it look crazy," including pulling down the victim's pants and panties and pouring out a container of lotion onto her buttocks and legs. He placed an envelope on which he had written "[y]ou owe me money" on the victim's buttocks and put a pair of eyeglasses and a small knife on top of the envelope. He wrote "I will kill" on the couch, "trying to make it look like somebody crazy did that to [the victim]."

Defendant took several additional actions to conceal his identity and to mislead investigators: He used a dampened towel to wipe down the handle of a knife and to wipe off what he thought was blood on the wall above the victim's bed, used scissors to cut out bloody parts of the top sheet and mattress on the victim's bed, went to a rear window on the ground floor and tried to pry it open with his hammer until the lock broke, cut the telephone line, and spread credit cards on top of the victim's body. He placed the pieces of duct tape that he removed from the victim's arms and legs and the pieces of bed sheet and mattress he had removed from the victim's bed in his duffle bag. Defendant took seventeen dollars from the victim's kitchen countertop and her vehicle keys and checked the house to make sure he did not forget anything. He then drove her SUV to the rear of a nearby grocery store in order to dispose of his hat and duffle bag. Returning to the victim's residence, he parked the vehicle in the same place it was before and wiped it down to remove fingerprints.

Defendant went into the victim's residence once more to retrieve his hammer and smoke a cigarette. He also went upstairs to check on Devin, returned the victim's vehicle keys to the kitchen countertop, and turned off all the lights before leaving through the back door of the residence and walking back to his parents' house, entering through the basement door to his room. He smoked another cigarette and reflected on what he had done, then went to sleep at approximately 5:00 a.m.

At the conclusion of his statement, defendant explained that he stabbed the victim because he could not calm her down or convince her not to call the police and that "[i]f she had agreed not to tell on [him], [he] would not have killed her."

## III. DEFENDANT'S CONVICTION AND APPEAL AS OF RIGHT

On 15 December 2003, the Ashe County Grand Jury returned a true bill of indictment charging defendant with the first-degree murder of Deborah Sturgill Veler. On 2 February 2005, following defendant's trial in Ashe County Superior Court, a jury returned its verdict finding defendant guilty of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. On 8 February 2005, following a sentencing hearing, the jury returned its binding recommendation that defendant be sentenced to death. The same day, the trial court entered its judgment consistent with the jury's recommendations. Defendant now appeals his conviction and sentence of death to this Court as of right pursuant to N.C.G.S. § 7A-27(a).

## ANALYSIS

### I. JURY SELECTION

[1] Defendant assigns error to the reopening of *voir dire* of two prospective jurors based upon the trial court's finding that both had provided incorrect statements in response to the State's initial *voir dire* questioning. The governing statute provides in part:

> (g) If at any time after a juror has been accepted by a party, and before the jury is impaneled, it is discovered that the juror has made an incorrect statement during voir dire or that some other good reason exists:
>
> (1) The judge may examine, or permit counsel to examine, the juror to determine whether there is a basis for challenge for cause.
>
> (2) If the judge determines there is a basis for challenge for cause, he must excuse the juror or sustain any challenge for cause that has been made.
>
> (3) If the judge determines there is no basis for challenge for cause, any party who has not exhausted his peremptory challenges may challenge the juror.

N.C.G.S. § 15A-1214(g) (2005). It is well settled that "the decision to reopen *voir dire* rests in the trial court's discretion" and the trial court's decision will not be overturned absent an abuse of that discretion. *See State v. Bond*, 345 N.C. 1, 19, 478 S.E.2d 163, 172 (1996)

(citing *State v. Parton*, 303 N.C. 55, 70-71, 277 S.E.2d 410, 421 (1981)), *cert. denied*, 521 U.S. 1124 (1997). Applying this standard of review to the instant case, we find no abuse of discretion in the trial court's decision to reopen *voir dire* of either juror.

During the State's *voir dire* on 18 January 2005, prospective jurors Jason Ryan Brown and Dennis Jeffrey Dancy were both questioned as to whether they had "[a]ny close friends or relatives who have either been a witness, a defendant, or a victim in a criminal case." The record indicates that neither Brown nor Dancy raised his hand to respond in the affirmative.

On 19 January 2005, the State passed a panel of twelve jurors that it found acceptable—including Brown and Dancy—to the defense. Subsequently, and before the jury was impaneled, it came to the State's attention that both jurors had relatives who had been defendants in criminal cases, although neither had indicated this when asked initially. When Dancy was questioned by defense counsel on *voir dire*, he mentioned for the first time that he had "[s]ome cousins that have been convicted of capital crimes." Additionally, the State was informed by law enforcement officers that Brown's biological father had been convicted of murder and that his uncle was a fugitive from justice suspected of murder.

Defendant exercised eight peremptory challenges following his *voir dire* of the twelve prospective jurors and found four of them acceptable, including Brown and Dancy. The State then moved to reopen *voir dire* of Brown and Dancy, and the trial court allowed these motions pursuant to N.C.G.S. § 15A-1214(g) over defendant's objection. After further questioning of Brown and Dancy, the State exercised a peremptory challenge for both of these prospective jurors.

With regard to Brown and Dancy, defendant contends that the two prospective jurors did not answer the prosecutor's initial question incorrectly because that question "went only to 'close family members or friends.' " Thus, defendant argues, since neither Brown's biological father and uncle nor Dancy's distant cousins can be considered "close family members," the trial court abused its discretion by reopening *voir dire* as to Brown and Dancy. Defendant relies in part on what he refers to as an "acknowledgment" of prosecutors that the question was an inquiry into "close family members or friends." This reliance is misplaced for two reasons: First, the statement cited by defendant as an "acknowledgment" was not uttered by the prose-

cutor *who actually conducted the voir dire.* Second, throughout the hearing on the State's motions to reopen *voir dire* the word "relative" is used by prosecutors at least three times and the phrase "close family members" only once—the instance cited by defendant.

Instead, the record reveals that the actual question asked by the State was an inquiry into "[a]ny close friends or relatives." This phrase is open to two interpretations with regard to the adjective "close." One is that this adjective modifies both "friends" *and* "relatives." The other is that it only modifies "friends" and therefore the word "relatives" remains unmodified. We cannot say the trial court abused its discretion by relying upon the latter interpretation in determining whether Brown and Dancy provided incorrect statements during the State's *voir dire.*

Defendant further argues that Brown had no "family relationship" with his biological father and uncle, "[b]oth as a practical fact and as a matter of law," as he had been adopted as a teenager. Defendant cites *Crumpton v. Mitchell,* 303 N.C. 657, 281 S.E.2d 1 (1981), to support his contention that legal adoption terminates "all family ties with a biological parent and his kin." However, the Court in *Crumpton* merely stated that "the *legal* relationship with the child's natural parents and family would by virtue of the adoption order be completely severed." *Id.* at 663, 281 S.E.2d at 5 (emphasis added). Defendant cites no case, statute, or any other authority that suggests the term "relative" in its well-accepted usage does not apply to an individual's biological father. In fact, the dictionary definition of "relative" tends to support the opposite conclusion. *See Black's Law Dictionary* 1315 (8th ed. 2004) (defining the term as "[a] person connected with another by blood or affinity; a person who is kin with another"); *Miriam-Webster's Collegiate Dictionary* 987 (10th ed. 1999) (defining the term as "a person connected with another by blood or affinity").

Defendant does not specifically address whether Dancy's cousins could be considered "relatives," but only whether these are included under "close family members." Nevertheless, defendant broadly asserts that the State "never inquired about distant cousins." Again, it was not an abuse of discretion for the trial court to interpret the State's use of "relatives" as unmodified by the word "close." Thus, it would have also been within the trial court's discretion to interpret the State's question as an inquiry into anyone connected to the prospective jurors "by blood or affinity," to include "distant" cousins.

Defendant has failed to demonstrate that the trial court abused its discretion by reopening *voir dire* as to either Brown or Dancy. Rather, the record supports a finding that these two prospective jurors made incorrect statements in the initial *voir dire* questioning by the State. Accordingly, this assignment of error is overruled.

## II. GUILT-INNOCENCE PHASE PROCEEDINGS

### A. *Right to Counsel During Psychiatric Evaluation*

[2] Defendant assigns error to an order of the trial court barring him from consulting with counsel during his mid-trial psychiatric evaluation by the State's mental health expert, asserting that this was a violation of his state and federal constitutional rights to counsel. The timing of the evaluation apparently resulted from a breakdown of communication between prosecutors and defense counsel during pretrial preparation. On 10 December 2004, when the State's expert, Robert S. Brown, Jr., M.D., a board-certified forensic psychiatrist on the clinical faculty at the University of Virginia, attempted to evaluate defendant, it was without the prior knowledge of defense counsel. Consequently, when Dr. Brown advised defendant of his right to remain silent, defendant exercised that right, thus terminating the interview. Although the State subsequently informed defense counsel of defendant's refusal, no additional attempts were made by either side to arrange another evaluation.

Instead, on the second day of the State's case-in-chief, the State moved to bar the testimony of defendant's own mental health expert pursuant to *State v. Braxton*, 352 N.C. 158, 531 S.E.2d 428 (2000), *cert. denied*, 531 U.S. 1130 (2001), on the basis of defendant's refusal to submit to the State's evaluation. When the State made its motion, it was the first time the trial judge was apprised of the issue. In an effort to remedy the situation in a manner that would be fair to both parties and to spare defendant the harsh consequence of having the only evidence in support of his theory of defense barred, the trial court ordered the 27 January 2005 examination that is the subject of defendant's assignment of error. However, the trial court also admonished the State for its delay in bringing the matter to the court's attention. Needless to say, better communication between the attorneys on both sides would have spared all of the parties this unnecessary burden. *See State v. Maske*, 358 N.C. 40, 62, 591 S.E.2d 521, 535 (2004) (Brady, J., concurring) (noting how such lapses of judgment by counsel in capital cases "are unacceptable given the gravity of the setting,

the dwindling resources available to our judiciary, and the expanding caseload of the judiciary" (citation omitted)).

Defendant's argument that the trial court's order deprived him of his right to counsel was not preserved as a consequence of his failure to timely object at trial. *See* N.C. R. App. P. 10(b)(1). To the contrary, the following exchange took place between the trial court and defense counsel:

> COURT: He doesn't have any right to call for you to come in or right to go talk to you or anything else. He needs to understand that and you need to fully tell him that under these cases, the examination is the doctor's. When he finishes with it, then he comes back and talks to you after it's over.
>
> [DEFENSE COUNSEL]: That's fine, Judge.

"Even alleged errors arising under the Constitution of the United States are waived if defendant does not raise them in the trial court." *State v. Jaynes*, 342 N.C. 249, 263, 464 S.E.2d 448, 457 (1995) (citing *State v. Upchurch*, 332 N.C. 439, 421 S.E.2d 577 (1992); *State v. Mitchell*, 317 N.C. 661, 346 S.E.2d 458 (1986)), *cert. denied*, 518 U.S. 1024 (1996); *see also State v. Golphin*, 352 N.C. 364, 465, 533 S.E.2d 168, 234 (2000), *cert. denied*, 532 U.S. 931 (2001); *State v. Call*, 349 N.C. 382, 410, 412, 508 S.E.2d 496, 514-15 (1998) (citing *Jaynes*). Defendant also failed to assign plain error to the trial court's order. *See* N.C. R. App. P. 10(c)(4) (stating a defendant must "specifically and distinctly" assign plain error to preserve a question for appellate review that is otherwise waived pursuant to N.C. R. App. P. 10(b)(1)); *see also, e.g., Golphin*, 352 N.C. at 465, 533 S.E.2d at 234 (holding that a capital defendant's argument was waived when it was not preserved under N.C. R. App. P. 10(b)(1) and defendant did not "specifically and distinctly" assign plain error as required by N.C. R. App. P. 10(c)(4)). This assignment of error has therefore been waived and is dismissed. *See Jaynes*, 342 N.C. at 263, 464 S.E.2d at 457.

## B. Defense Counsel's "Concession" During Closing Argument

[3] Defendant asserts that his state and federal constitutional rights to the effective assistance of counsel were denied when defense counsel stated in closing arguments that "[defendant's] statement alone guarantees he'll serve a substantial amount of time in prison and face the terrible consequences of a *first degree* murder conviction." (Emphasis added.) Defendant contends that this amounts to a

concession of defendant's guilt of first-degree murder and that, because this concession was made without his consent, the statement was per se ineffective assistance of counsel and would therefore warrant a new trial.

Generally, this Court "indulges the presumption that trial counsel's representation is within the boundaries of acceptable professional conduct," giving counsel "wide latitude in matters of strategy." *State v. Campbell*, 359 N.C. 644, 690, 617 S.E.2d 1, 30 (2005) (citations and internal quotation marks omitted), *cert. denied*, 547 U.S. 1073 (2006). To prevail on an ineffective assistance of counsel claim, a defendant must show that trial counsel's conduct " 'fell below an objective standard of reasonableness.' " *See id.* at 690, 617 S.E.2d at 29 (quoting *State v. Braswell*, 312 N.C. 553, 561-62, 324 S.E.2d 241, 248 (1985) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984))). This requires a showing that, first, trial counsel's performance was so deficient that he or she "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and second, this deficient performance prejudiced the defense, such that the errors committed by trial counsel deprived the defendant of a fair trial. *Id.* (quoting *Strickland*, 466 U.S. at 687 (internal quotation marks omitted)).

In *State v. Harbison*, this Court held that

[w]hen counsel admits his client's guilt without first obtaining the client's consent, the client's rights to a fair trial and to put the State to the burden of proof are completely swept away. The practical effect is the same as if counsel had entered a plea of guilty without the client's consent. Counsel in such situations denies the client's right to have the issue of guilt or innocence decided by a jury.

315 N.C. 175, 180, 337 S.E.2d 504, 507 (1985) (citation omitted), *cert. denied*, 476 U.S. 1123 (1986). More recently, in *State v. Matthews*, this Court stated that "*Harbison* error" amounts to a per se violation of a defendant's right to the effective assistance of counsel. 358 N.C. 102, 109, 591 S.E.2d 535, 540-41 (2004). Here, defendant asserts that the statement in question was *Harbison* error. We disagree.

In *Harbison*, the defendant maintained throughout the trial that he had acted in self-defense when the State's evidence tended to show that he shot his former girlfriend and shot and killed a man who was with her at the time. 315 N.C. at 177, 337 S.E.2d at 505-06.

Although counsel for the defendant adhered to this theory of self-defense when cross-examining the State's witnesses and presenting the defendant's case-in-chief, during closing arguments counsel expressed his personal opinion that the defendant should be found guilty of manslaughter:

> Ladies and Gentlemen of the Jury, I know some of you and have had dealings with some of you. I know that you want to leave here with a clear conscious [sic] and I want to leave here also with a clear conscious [sic]. I have my opinion as to what happened on that April night, and I don't feel that [the defendant] should be found innocent. I think he should do some time to think about what he has done. I think you should find him guilty of manslaughter and not first degree.

*Id.* at 177-78, 337 S.E.2d at 506. The Court found this concession of guilt a per se violation of the defendant's right to the effective assistance of counsel and, accordingly, arrested the judgments against the defendant and awarded him a new trial. *Id.* at 180-81, 337 S.E.2d at 507-08.

In *Matthews*, the defense counsel made the following statement in closing arguments:

> There are three possible verdicts in that case. . . . You have a possible verdict of guilty of first-degree murder. . . .

> You have a possible verdict of guilty of second-degree murder. And then the third possibility is not guilty. I've been practicing law twenty-four years and I've been in this position many times. And this is probably the first time I've come up in front of the jury and said *you ought not to even consider that last possibility.*

358 N.C. at 106, 591 S.E.2d at 539. Trial counsel later added, "When you look at the evidence . . . you're going to find that he's guilty of second-degree murder." *Id.* Noting that counsel made this concession of guilt apparently without advising his client, this Court held this was *Harbison* error and awarded the defendant a new trial. *Id.* at 109, 591 S.E.2d at 540-41.

A review of the record in the instant case demonstrates that the statement of defense counsel to which defendant assigns error clearly did not amount to *Harbison* error. Rather, when this statement is viewed in the context of defense counsel's entire closing

argument, it appears that his reference to first-degree murder was accidental and went unnoticed. The final words of the closing argument bear this out:

> And as you go back into that jury room, I only ask that you keep that open mind as you deliberate, that you consider the evidence objectively, clearly, in consultation with each other, that you remember the rage, the freaking out, the out of control that's evident from the State's own evidence, and you return the verdict that the evidence supports, *guilty of second degree murder*. Thank you.

(Emphasis added.) In fact, the only issue even contested at defendant's trial was whether he had committed first-degree or second-degree murder, and trial counsel's entire closing argument was directed toward undercutting the two theories of first-degree murder advanced by the State: felony murder and murder committed with premeditation and deliberation.

Defendant would have this Court interpret *Harbison* to allow a defendant to seize upon a *lapsus linguae* uttered by trial counsel in order to be awarded a new trial. However, we are unconvinced that the statement in question amounted to a concession of defendant's guilt of first-degree murder. Absent such a concession, defendant has the burden of showing that his trial counsel's performance fell below an objective standard of reasonableness, a burden which defendant has failed to carry. *See Strickland*, 466 U.S. at 687-88. Accordingly, this assignment of error is overruled.

### C. *Argument by Prosecutor Concerning Attack of Rob Willis*

[4] Defendant contends that the trial court should have intervened *ex mero motu* during the State's closing argument. At trial, the State presented testimony of Rob Willis, who was confined with defendant in the Ashe County Jail for a period of time. This testimony tended to prove that defendant assaulted Willis in retaliation for reporting to authorities an incriminating statement defendant had made to him in regard to the murder. Over defendant's objection, the trial court admitted this evidence for the limited purpose of showing defendant's consciousness of guilt at the time of the offense. During closing argument, the prosecutor made the following statements:

> I want to touch on another thing with regard to eliminating [the victim] who was a witness. [Defendant] thought that, you know, he had assaulted her in a very bad way, and when he came

back, it would be the State's contention that he did that for the purpose of eliminating her ability to testify against him, to put him back in jail. You know, people tend to do things repeatedly. He, basically, attempted to do the same thing by eliminating a witness with regard to Rob Willis in the jail. That is Rob Willis, he knew, was going to testify against him, perhaps. And what did he do with regard to Rob Willis? Does that show his ability to plan and think ahead.

Defendant asserts that the trial court's failure to bar these statements of the prosecutor constitutes reversible error because the prosecutor was arguing the evidence for a different, inadmissible purpose—namely, to prove defendant's bad character—in violation of the North Carolina Rules of Evidence. *See* N.C.G.S. § 8C-1, Rule 404(a) (2005).

We note for purposes of review that defendant did not object to these statements at trial. Thus, "the prosecutor's argument is subject to limited appellate review for gross improprieties which make it plain that the trial court abused its discretion in failing to correct the prejudicial matters *ex mero motu*." *State v. Alston*, 341 N.C. 198, 239, 461 S.E.2d 687, 709 (1995), *cert. denied*, 516 U.S. 1148 (1996); *see also State v. Jones*, 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002); *State v. Trull*, 349 N.C. 428, 451, 509 S.E.2d 178, 193 (1998), *cert. denied*, 528 U.S. 835 (1999); *State v. Tyler*, 346 N.C. 187, 205, 485 S.E.2d 599, 609, *cert. denied*, 522 U.S. 1001 (1997).

Generally, "prosecutors are given wide latitude in the scope of their argument" and may "argue to the jury the law, the facts in evidence, and all reasonable inferences drawn therefrom." *Alston*, 341 N.C. at 239, 461 S.E.2d at 709-10 (citing *State v. Syriani*, 333 N.C. 350, 398, 428 S.E.2d 118, 144, *cert. denied*, 510 U.S. 948 (1993)). Statements or remarks in closing argument "must be viewed in context and in light of the overall factual circumstances to which they refer." *Id.* at 239, 461 S.E.2d at 709 (citation omitted). Additionally, as a general rule, a trial court cures any prejudice resulting from a prosecutor's misstatements of law by giving a proper instruction to the jury. *See Trull*, 349 N.C. at 452, 509 S.E.2d at 194.

Even if we assume *arguendo* that the closing argument in this case was grossly improper, we conclude that any prejudice to defendant was cured by the trial court's instructions to the jury following closing arguments. The trial court stated in these instructions that the State's evidence as to Willis could only be considered for the limited purposes of showing defendant's consciousness of guilt and

**STATE v. GOSS**

[361 N.C. 610 (2007)]

as a basis for expert opinion regarding defendant's mental state at the time of the alleged murder. Because defendant cannot show that the trial court failed to correct any prejudice that might have resulted from the State's closing argument, this assignment of error is overruled.

### III. PRESERVATION ISSUES

Defendant raises three preservation issues. First, defendant assigns error to the trial court's instructions to the jury on Issue 4 of the issues and recommendations as to punishment form, which requires the jury to determine whether the aggravating circumstances are sufficiently substantial to impose the death penalty. Defendant objects to the instruction requiring that the jury must unanimously fail to find the aggravating circumstances sufficiently substantial before they can answer this issue in the negative. This Court rejected the same argument in *State v. McCarver*, 341 N.C. 364, 390, 462 S.E.2d 25, 39 (1995), *cert. denied*, 517 U.S. 1110 (1996), and again in *State v. Elliott*, 360 N.C. 400, 422, 628 S.E.2d 735, 750, *cert. denied*, —— U.S. ——, 127 S. Ct. 505, 166 L. Ed. 2d 378 (2006). We similarly decline to overrule this precedent in the present case.

Second, defendant assigns error to the trial court's instruction to the jury that it had the "duty" to impose the death penalty if it found that the mitigating circumstances failed to outweigh the aggravating circumstances. This argument was rejected in *State v. Skipper*, 337 N.C. 1, 57, 446 S.E.2d 252, 283-84 (1994), *cert. denied*, 513 U.S. 1134 (1995), and again in *Elliott*, 360 N.C. at 422, 628 S.E.2d at 750. We also reject defendant's argument in this case.

Finally, defendant assigns error to the trial court's definition of mitigating circumstances contained in its instructions to the jury as being too narrow and precluding the jury from considering all relevant mitigating information. Again, this Court previously rejected the same argument. *See State v. Conaway*, 339 N.C. 487, 533-34, 453 S.E.2d 824, 853-54, *cert. denied*, 516 U.S. 884 (1995); *Skipper*, 337 N.C. at 52-53, 446 S.E.2d at 280-81. We decline to overrule this established precedent in the present case.

Accordingly, these three assignments of error are overruled.

### IV. PROPORTIONALITY ISSUES

[5] Having determined that defendant's trial and sentencing proceeding were free of prejudicial error, we must now consider:

(1) whether the record supports the aggravating circumstances found by the jury and upon which the sentence of death was based; (2) whether the death sentence was entered under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the facts of the crime and the defendant.

*State v. Cummings*, 361 N.C. 438, 477, 648 S.E.2d 788, 811 (2007) (citing N.C.G.S. § 15A-2000(d)(2) (2005)).

In this case, the jury found two aggravating circumstances to exist beyond a reasonable doubt: (1) defendant committed the murder for the purpose of avoiding a lawful arrest, *see* N.C.G.S. § 15A-2000(e)(4) (2005), and (2) the murder was especially heinous, atrocious, or cruel, *see* N.C.G.S. § 15A-2000(e)(9) (2005). The State's evidence clearly supports both of these aggravating circumstances. From defendant's confession alone, a jury could have found that he committed the murder for the purpose of avoiding lawful arrest, as he admitted that he would not have committed the murder if the victim had agreed not to call the police to report his assault upon her. This evidence was sufficient to support the (e)(4) aggravating circumstance.

Also from defendant's confession alone, a jury could have found that the murder was especially heinous, atrocious, or cruel. Defendant twice beat the victim into an unconscious state in an apparent effort to make her forget he was ever at the residence. He needlessly stabbed her over fifty times with at least two different knives, pausing several times between series of stabs, thereby prolonging the victim's suffering. Only after inflicting multiple wounds to the victim's back did defendant finally inflict a wound calculated to end her life, slitting her throat as she was gasping her final breaths. Lastly, defendant left the victim's three-year-old grandson alone in the residence after the murder, making it highly probable that the child would awaken to discover his grandmother dead on the living room floor, half naked in a pool of blood with knives protruding from her body. This evidence was sufficient to support the (e)(9) aggravating circumstance.

There is no indication anywhere in the record that the jury was under the influence of passion, prejudice, or any other arbitrary factor when it recommended a sentence of death for defendant. As it appears instead that the jury carefully considered and weighed each

**STATE v. GOSS**

[361 N.C. 610 (2007)]

of the aggravating and mitigating circumstances and entered a reasoned decision in accordance with the law, we are compelled to leave the jury's recommendation of death undisturbed.

Finally, this Court must determine whether defendant's sentence is disproportionate. Ultimately, proportionality review rests upon the experienced judgments of the members of the Court. *Elliott*, 360 N.C. at 425, 628 S.E.2d at 752 (citations omitted). In its determination, the Court must compare defendant's case with all similar cases in this jurisdiction, though we are not bound to cite each of these. *See Cummings*, 361 N.C. at 477-78, 648 S.E.2d at 812 (citations omitted). Although defendant asserts that this process is vague and arbitrary in violation of his state and federal constitutional rights, we decline any invitation from defendant to depart from this well-settled practice. *See Elliott*, 360 N.C. at 425, 628 S.E.2d at 752; *McNeill*, 360 N.C. at 254, 624 S.E.2d at 344.

There have been eight cases in which this Court has determined that the death sentence was disproportionate. *State v. Kemmerlin*, 356 N.C. 446, 573 S.E.2d 870 (2002); *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled in part on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). As the Court noted in *State v. Cummings*, in only two of these eight cases, *Stokes* and *Bondurant*, did the jury find the aggravating circumstance that the murder was especially heinous, atrocious, or cruel:

> In *Stokes*, the defendant was seventeen years old and the only one of four assailants to receive the death penalty. 319 N.C. at 3-4, 21, 352 S.E.2d at 654-55, 664. In *Bondurant*, the defendant showed immediate remorse for his actions and even directed the victim's transport to the hospital, hoping to see the victim live. 309 N.C. at 694, 309 S.E.2d at 182-83.

361 N.C. at 478, 648 S.E.2d at 812.

*Stokes* and *Bondurant* can easily be distinguished from this case. Defendant here was the only assailant, was twenty-eight-years old at the time of the offense, sought no medical treatment for the victim,

and failed to show any immediate remorse for the murder, instead expending considerable time and effort toward concealing his identity and misleading investigators. Also in contrast to the defendant in *Bondurant*, defendant here did not readily and immediately admit his guilt. *See Bondurant*, 309 N.C. at 694, 309 S.E.2d at 182-83. He did so only after becoming the primary focus of the murder investigation and being ordered to submit hair and blood samples that he knew would implicate him in the murder. Accordingly, after careful review, we find that defendant's sentence of death is proportionate to the crime he committed.

## V. CONCLUSION

[6] The remaining assignments of error presented by defendant and not set out or argued in his brief are deemed abandoned. *See* N.C. R. App. P. 28(b)(6); *Cummings*, 361 N.C. at 479, 648 S.E.2d at 812-13 (citing *McNeill*, 360 N.C. at 241, 624 S.E.2d at 336). We conclude that defendant received a fair trial and sentencing proceeding, that his conviction and sentence were free from prejudicial error, and that the sentence of death is not disproportionate to the crime for which defendant was convicted.

NO ERROR.