An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA14-1120

Filed: 18 August 2015

Gaston County, Nos. 13 CRS 50532, 50588

STATE OF NORTH CAROLINA

v.

JITEN ASHWIN PATEL

Appeal by defendant from judgment entered 19 May 2014 by Judge Robert C. Ervin in Gaston County Superior Court. Heard in the Court of Appeals 5 March 2015.

> *Roy Cooper, Attorney General, by David J. Adinolfi II, Special Deputy Attorney General, for the State.*

> *Staples Hughes, Appellate Defender, by John F. Carella, Assistant Appellate Defender, for defendant-appellant.*

DAVIS, Judge.

Jiten Ashwin Patel ("Defendant") appeals from a judgment finding him guilty of first-degree murder, breaking or entering, and larceny after breaking or entering. On appeal, Defendant contends that the trial court (1) committed plain error by admitting into evidence an incomplete transcript of Defendant's videotaped interview with police officers; and (2) erred by instructing the jury that self-defense was not a defense to the charge of felony murder. After careful review, we conclude that Defendant received a fair trial free from prejudicial error.

**Factual Background**

In January of 2013, Defendant, then twenty-eight years old, lived with his parents in Mount Holly, North Carolina. Except when in college, undergoing drug rehabilitation, or incarcerated, Defendant had always lived with his parents. Defendant was a drug addict, having begun using drugs at the age of sixteen. He began to use cocaine in college, and was suspended for possession of powder cocaine and later expelled for breaking or entering and larceny. In 2006, he began using crack cocaine.

Defendant's parents had tried to help Defendant end his addiction, sending him to boarding school and paying for two drug rehabilitation programs. Defendant's father, Ashwin Patel ("Ashwin"), helped Defendant find a wife in India and offered to pay for the wedding if Defendant quit using drugs. From 2011 to 2012, Defendant avoided regular drug use. However, at some point thereafter, he began using them once more. This use of drugs was the source of considerable acrimony between him and Ashwin.

On 11 January 2013, Defendant and Ashwin were working in Ashwin's Quick Stop convenience store. Defendant discovered a check on the floor of the store and used it to buy crack cocaine, which he smoked in the store bathroom while Ashwin pounded on the door for him to come out. That afternoon, Defendant and Ashwin left the store in Ashwin's car, a gold Toyota Camry.

At 10:42 p.m., Officer Robert Ellison ("Officer Ellison") with the Mount Holly Police Department arrived at Ashwin's home for a "welfare check" as to Ashwin's safety and found Ashwin's body lying face down in the living room, surrounded by pools of blood. It was apparent that he had been shot in the head. Additional officers were dispatched to the scene. Officer William Terry ("Officer Terry") found a handwritten note in a bedroom of the residence that read, "I would have ruined everyone's life. I sent dad to a better place. After I'm done, I'm gonna kill myself; hate my life." It was signed "Jiten." The house was disheveled, apparently from having been ransacked. Officer Terry also investigated Ashwin's store and found that someone had broken into it.

On 12 January 2013, just before noon, Sergeant R. B. Battle ("Sgt. Battle") received a description of Ashwin's vehicle on his radio. He saw the gold Camry emerge from a shopping complex and drive over a raised concrete median. Sgt. Battle reported the discovery of the Camry to dispatch and began to follow it on the highway. The Camry was ultimately stopped by a police roadblock at the top of an on-ramp. Defendant, who was driving the vehicle, emerged from the Camry at the urging of officers. Sgt. Battle observed what appeared to be blood on Defendant's finger. Officer Terry identified blood stains on Defendant's pants and shoes. As Officer Lewis, one of the arresting officers, was patting Defendant down, Defendant stated, "It's over here on my waist band." Officer Lewis then discovered a small semi-

automatic handgun in Defendant's waistband. The gun was a .38 caliber Taurus with blood stains on the muzzle and grip.

Defendant was arrested and taken to the Gaston County Police Department where he voluntarily gave a recorded interview in which he admitted to having shot Ashwin. At some point, officers stopped the interview so that paramedics could treat the wound on Defendant's finger. Defendant subsequently wrote out and signed a statement regarding the circumstances surrounding the death of Ashwin. He was taken to a hospital to have his finger examined and then taken to jail.

Defendant was indicted on charges of first-degree murder, breaking or entering, and larceny after breaking or entering. A jury trial was held on 12 May 2014 in Gaston County Superior Court before the Honorable Robert C. Ervin.

At trial, the video recording of Defendant's interview was played for the jury. During the interview, Defendant acknowledged that "I shot my dad." According to Defendant:

> [Ashwin] found out I was on drugs. We were arguing and stuff and then -- he pulled the gun out on himself first. He said, "I'm tired of this. I just don't want" -- and I kind of pushed him and took the gun from him. I tried to, at least, but it didn't -- I didn't get the gun and we were scuffling and scuffling and I lost my temper and I just -- I shot. When I shot, I shot my hand, as well.

Defendant further stated during the interview that, after he shot Ashwin, he "ran through the house. I panicked and I knew I was going to go to jail. I took

everything I could and tried to run." He related that he took, among other things, his father's necklace, jewelry, and wallet and then went to buy drugs. He stated that later that night, he went to the Quick Stop store and "got some change for more drugs and a couple of cigarette cartons."

After the recording was played for the jury, Officer Terry testified that a portion of the interview, during which Defendant was "talking about killing himself[,]" had not been transcribed. He testified that there were no other additions or deletions in the transcript. Both the videotape of the interview and the written transcript were admitted into evidence without objection from defense counsel.

The State introduced the expert testimony of Dr. Christopher Jennings Gulledge ("Dr. Gulledge"), a medical examiner. Dr. Gulledge, who performed the autopsy on Ashwin, noted four gunshot wounds to the head as well as a gunshot wound to the left hand. The first head shot resulted in a "contact" wound, meaning that the gun was placed directly against Ashwin's head. The second shot to the head was fired from an indeterminate range. Dr. Gulledge testified that either of these injuries would have incapacitated Ashwin immediately, and that death "would occur within a very short period of time." The third head shot came from close range, "probably within two feet[,]" located within the corner of the eye. This injury went through the brain and would have left Ashwin incapacitated, "unconscious immediately and dead within a very short period of time." The fourth head wound

was located behind the head, and Dr. Gulledge described it as "a very, very sharply downward wound[,]" which traveled down through Ashwin's neck, rib, and breast bone, and left no exit wound. Dr. Gulledge testified that this wound was consistent with a seated victim, not with somebody involved in a struggle. The fifth gunshot wound was to Ashwin's thumb, and Dr. Gulledge testified that "the gun was a distance away at the time it struck the thumb." With regard to the timing of the head wounds, Dr. Gulledge further testified based upon his findings that "a lot happened between these . . . gunshot wounds." He opined that the shots were distinct in time — as opposed to being fired in rapid succession — and came from different angles and distances.

Sgt. Battle testified that there had been a break-in at Ashwin's Quick Stop store on the night of the shooting. Officer Lewis testified that forensic evidence revealed that Defendant's blood was found on the lock of the store.

During the charge conference, the State requested that (1) an instruction on felony murder be submitted to the jury (with armed robbery serving as the predicate felony); (2) this instruction reference the fact that a defendant could be found guilty of felony murder if the murder and the robbery were part of one continuous transaction; and (3) this instruction also explain that a deceased person is legally capable of being robbed. The State also requested that the trial court instruct the jury that self-defense is not a defense to felony murder, and defense counsel objected

to this particular instruction. Despite defense counsel's objection, the trial court proceeded to give all of the State's requested instructions.

The jury found Defendant guilty of first-degree murder both based on premeditation and deliberation and under the felony murder rule. The jury also found him guilty of breaking or entering and larceny after breaking or entering. Defendant was sentenced to (1) life imprisonment without the possibility of parole for first-degree murder; (2) 10-21 months for breaking or entering; and (3) 10-21 months for larceny after breaking or entering. Defendant filed a timely notice of appeal to this Court.

**Analysis**

**I. Admission of Transcript**

Defendant contends that the trial court committed plain error by admitting the transcript of Defendant's interview with law enforcement officers. We disagree.

Defendant did not object to the admission of the transcript at trial. "In criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed preserved by rule or law without any such action nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error." N.C.R. App. P. 10(a)(4); *see also State v. Goss*, 361 N.C. 610, 622, 651 S.E.2d 867, 875 (2007), *cert. denied*, 555 U.S. 835, 172 L.Ed.2d 58 (2008).

> [T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or where [the error] is grave error which amounts to a denial of a fundamental right of the accused, or the error has resulted in a miscarriage of justice or in the denial to appellant of a fair trial or where the error is such as to seriously affect the fairness, integrity or public reputation of judicial proceedings or where it can be fairly said the instructional mistake had a probable impact on the jury's finding that the defendant was guilty.

*State v. Lawrence*, 365 N.C. 506, 516-17, 723 S.E.2d 326, 333 (2012) (citations and quotation marks omitted).  Therefore, we review this issue solely for plain error.

Defendant argues that the transcript of the police interview submitted to the jury was not accurate as it had been "materially altered[.]"  Defendant therefore asserts that the admission of the transcript into evidence violated Rules 1002 and 1003 of the North Carolina Rules of Evidence.

Rule 1002 states that a party seeking to "prove the contents of a writing, recording, or photograph" must produce the original.  N.C.R. Evid. 1002.  However, Rule 1003 provides that "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original."  N.C.R. Evid. 1003.

Defendant points to (1) the omission in the transcript of a ten-minute section of the interview during which Defendant's injury was attended to; (2) the omission of several statements by Defendant reflecting his suicidal intent; and (3) various instances where the written transcript did not accurately reflect certain statements made in the video. Defendant contends that, as a result, the transcript did not meet the requirements for admission under Rule 1003.

Even assuming, without deciding, that the admission of the transcript under these circumstances constituted error, Defendant has failed to show plain error. Both the transcript and the video were offered into evidence. As a result, any omissions or inaccuracies in the transcript were remedied by the introduction of the video itself. Furthermore, we are satisfied that none of the omissions in the transcript substantially altered the key statements made by Defendant during the interview, during which Defendant admitted that he fired the shots that killed Ashwin and related the events both leading up to and following the shooting.

Specifically, Defendant points to the following discrepancies between the video and the transcript:

| Video | Transcript |
|---|---|
| I tried to, at least, but it didn't -- I didn't get the gun and we were scuffling and I lost my temper and I just -- in the middle of it I shot. When I shot, I shot my hand, as well. | I tried to, at least, but it didn't -- I didn't get the gun and we were scuffling and I lost my temper and I just -- I shot. When I shot, I shot my hand, as well. |

| | |
|---|---|
| Can you take me to the hospital? | (inaudible) to the hospital? |
| I think one of them actually missed, it was just a misfire somewhere in the house. | I think one of them actually missed, it was just a misfire. |
| Oh God. Originally my intent, I was going to kill myself after that. That was my plan.<br><br>Q. What made you stop or decide not to?<br><br>A. I think I still was going to do it. I think I was just going to wait until my time ran out. | (Omitted) |

We cannot agree that, as a result of these discrepancies, the admission of the transcript constituted plain error. Defendant argues in particular that the variance in language between the video and the transcript regarding him losing his temper with Ashwin was prejudicial. However, both the video and the transcript contain Defendant's admission that he did indeed lose his temper during the sequence of events, and Defendant makes too much of the discrepancy in language between the video and the transcript on this topic. This is particularly so in light of the evidence from Dr. Gulledge regarding the number of shots to Ashwin's head, the extent to which they would have incapacitated Ashwin immediately, the passage of time between the shots, and the fact that in addition to robbing Ashwin's body Defendant also robbed the store.

On plain error review, Defendant bears the burden of showing that the error had a probable impact on the jury's verdict. *Lawrence*, 365 N.C. at 516-17, 723 S.E.2d at 333. Because he has failed to meet this burden, Defendant's argument on this issue lacks merit.

## II. Jury Instruction

Defendant's final argument is that the trial court erred by instructing the jury over the objection of his counsel that self-defense is not a defense to felony murder. A party's arguments "challenging the trial court's decisions regarding jury instructions are reviewed *de novo* by this Court." *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009). "The prime purpose of a court's charge to the jury is the clarification of issues, the elimination of extraneous matters, and a declaration and an application of the law arising on the evidence." *State v. Cameron*, 284 N.C. 165, 171, 200 S.E.2d 186, 191 (1973), *cert. denied*, 418 U.S. 905, 41 L.Ed.2d 1153 (1974). "When determining whether the evidence is sufficient to entitle a defendant to jury instructions on a defense . . . courts must consider the evidence in the light most favorable to the defendant." *State v. Keitt*, 153 N.C. App. 671, 677, 571 S.E.2d 35, 39 (2002) (citations omitted), *aff'd per curiam*, 357 N.C. 155, 579 S.E.2d 250 (2003). It is also well settled, however, that "an error in jury instructions is prejudicial and requires a new trial only if 'there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached

at the trial out of which the appeal arises.'" *State v. Castaneda,* 196 N.C. App. 109, 116, 674 S.E.2d 707, 712 (2009) (quoting N.C. Gen. Stat. § 15A-1443(a) (2007)).

Here, the trial court instructed the jury on self-defense with regard to the theory of first-degree murder based upon premeditation and deliberation but declined to provide a self-defense instruction as to the first-degree murder charge predicated on the felony murder rule, instead stating that "self-defense in this case is not a defense to the charge of first-degree murder under the [f]elony [m]urder [r]ule."

This Court has previously held that "any error in allowing a jury to consider felony murder does not require a new trial if the jury also found the defendant guilty based on premeditation and deliberation." *State v. Mays*, 158 N.C. App. 563, 577, 582 S.E.2d 360, 369 (2003); *see also State v. McLemore,* 343 N.C. 240, 249, 470 S.E.2d 2, 7 (1996) (holding that "[a]lthough the defendant should not have been convicted of felony murder, the verdict cannot be disturbed if the evidence supports a conviction based on premeditation and deliberation").

Therefore, even assuming, without deciding, that the trial court erred in failing to instruct the jury on self-defense as to the felony murder charge, Defendant cannot show prejudicial error due to the fact that the jury also convicted him of first-degree murder based upon premeditation and deliberation.[1] Thus, the jury's finding on the charge of first-degree murder based upon premeditation and deliberation served as

---

[1] Defendant does not challenge the jury instructions issued by the trial court as to the premeditation and deliberation theory.

an independent basis for Defendant's conviction of first-degree murder.  Defendant's argument is therefore overruled.

### III. Conclusion

For the reasons set out above, we conclude that Defendant received a fair trial free from prejudicial error.

NO PREJUDICIAL ERROR.

Judges STROUD and DILLON concur.

Report per Rule 30(e).