NO. COA13-1235

NORTH CAROLINA COURT OF APPEALS

Filed: 17 June 2014

STATE OF NORTH CAROLINA

v.                              Rutherford County
                                No. 11 CRS 52801
                                   12 CRS 1594

HOWARD JUNIOR EDGERTON


Appeal by defendant from judgment entered 21 March 2013 by Judge Gary M. Gavenus in Rutherford County Superior Court. Heard in the Court of Appeals on 20 March 2014.

*Attorney General Roy Cooper, by Assistant Attorney General Teresa M. Postell, for the State.*

*Michael E. Casterline, for defendant-appellant.*

HUNTER, JR., Robert N., Judge.

Howard Junior Edgerton ("Defendant") appeals from a 21 March 2013 judgment sentencing him as a level VI offender for violating a domestic violence protective order ("DVPO") with a deadly weapon. Defendant argues that the trial court erred by failing to instruct the jury on the lesser-included misdemeanor offense of violation of a DVPO. We agree and order a new trial.

## I. Facts & Procedural History

Defendant was indicted on 9 July 2012 for violating a DVPO with a deadly weapon in 11 CRS 052801, and with assault with a deadly weapon with intent to kill ("AWDWIK"), assault by strangulation, and second-degree kidnapping in 11 CRS 052829. Defendant was indicted with AWDWIK and second-degree kidnapping in 11 CRS 052830 and 11 CRS 052831. On 9 July 2012, Defendant was charged with habitual felon status in 12 CRS 1594. Defendant stood trial on 18–21 March 2013 in Rutherford County Superior Court. The record and trial transcript tended to show the following facts.

Brandon Hamilton ("Mr. Hamilton") testified first for the State. Mr. Hamilton said Jacquie King ("Ms. King"), Amber Harkless ("Ms. Harkless"), and Dianna Moore ("Ms. Moore") drove to pick up Defendant around 9:30 or 10:00 p.m. on 27 August 2011. The group was traveling to the "Boom Boom Room," which Mr. Hamilton described as a "bootlegger" in Lake Lure, where the group "had a few drinks." Mr. Hamilton said he knew that Defendant and Ms. King were previously in a relationship before the evening's events took place.

Mr. Hamilton described Defendant as "cool" and "laid back" initially, but then said Defendant became angry after Mr.

Hamilton "complimented [Ms. King] on her weight loss." After Mr. Hamilton made these remarks, Mr. Hamilton said the situation escalated and that Defendant threatened him. After Defendant levied these threats, the group got into the car to take Defendant home, whereupon Defendant started hitting Ms. King and brandished a pocket knife. After the group stopped the car, Defendant left the vehicle, re-entered, and then began "sawing [Ms. King's] neck with a dull knife." Mr. Hamilton said he knew it was a dull knife because "if it was a sharp knife, I am pretty sure – he was sawing at it – she would be dead right now."

Mr. Hamilton told Ms. Harkless and Ms. King to leave the car, and Defendant continued to threaten them both. Ms. Harkless then drove Defendant to his home and later called police, who met Defendant at his home. Mr. Hamilton spoke with police when they arrived but did not give a statement at that time. Mr. Hamilton said Ms. King had "road rash and scars on her neck. She had a few knots on her." Mr. Hamilton said that Defendant's sawing of Ms. King's neck produced only scratches because the knife was "completely dull." Mr. Hamilton eventually gave a statement to police.

Ms. King testified at trial, saying she was in an abusive relationship with Defendant. Ms. King said she was afraid of Defendant and that Defendant

> beat me, punch[ed] me in my face. One time he kicked me down probably a 20-foot embankment. It was so many things. It was abuse every day. Hit me. He would get drunk and punch me in my face, kick me. He tried to burn my trailer one time. He pulled my mattress into the middle of my trailer. I had people staying with me that had a baby, and he said get your baby out of the house because I am about to burn this down.

Ms. King said she stayed in a relationship with Defendant because she was "scared of him" Ms. King later obtained a one-week temporary restraining order in April 2011 after she said Defendant "pulled a shotgun on" her and her friend. Ms. King later received a year-long DVPO requiring Defendant to avoid all contact with Ms. King.

After the DVPO was granted, Ms. King said Defendant continued to seek contact with her. Eventually Ms. King "went back to him" because she said Defendant "acted like he had changed – like he wasn't going to be abusive anymore." Ms. King said Defendant was "[c]alm, respectful, not aggressive at all" when he visited her home the two weeks prior to the evening at issue.

Ms. King said the trip to the Boom Boom Room was the first time that she went out to a club with Defendant since obtaining the DVPO. Ms. King also said Defendant was calm at first during the group's time at the Boom Boom Room, but that Defendant became aggressive and began to accuse her of having sexual relations with other members of the group. Ms. King said she began to get nervous and wanted to leave Defendant at the Boom Boom Room, but that Defendant was insistent that he be brought home. After the group allowed him to travel with them, Ms. King said Defendant became "wild" and that he began punching Ms. King in the face.

Ms. Harkless stopped the vehicle when she realized that Defendant was hitting Ms. King. Mr. Hamilton, Ms. Moore, and Defendant exited the vehicle and Mr. Hamilton and Ms. Moore confronted Defendant. Ms. King said that Defendant began to chase Ms. Moore and Mr. Hamilton with a knife and that Defendant was trying to inflict injuries with the knife. Ms. King said Defendant then reentered the vehicle, ordered Ms. Harkless to drive, and began "cutting [Ms. King's] throat." Ms. King said Defendant continued to choke her and told her she would die that evening. Ms. King also said Defendant wasn't "slicing [her] throat" but that Defendant was "digging in with the knife and

cutting knicks on my neck, cutting parts of my neck." Ms. King said the cuts on her neck bled, but she did not know the amount of blood produced by the cuts.

Ms. King said she was able to dislodge a car door while the vehicle was still traveling around 40 to 50 miles per hour toward Defendant's father's home, where Defendant lived. As the car approached the home at around 5 to 10 miles per hour, Ms. King said she was pushed by Defendant from the vehicle. Twenty minutes later, Ms. King said a number of police officers returned with Defendant in custody. Ms. King said Defendant was "beating his head against the police window and screaming [her] name" while officers took photos of her injuries.

Ms. King also described her interview with Detective Ricky McKinney ("Detective McKinney") of the Rutherford County Sheriff's Department. Ms. King initially told Detective McKinney that she met Defendant at the Boom Boom Room rather than that the group had picked Defendant up beforehand. Ms. King said her statement was not true and that she told Detective McKinney this because she did not want to disappoint her family. Ms. King also gave a statement to Detective McKinney, which also contained an incorrect statement about the composition of the group who traveled to the Boom Boom Room.

Corporal Stephen Ellis ("Corporal Ellis") testified next at trial. Corporal Ellis responded to a 911 hang-up call and information that Defendant "was assaulting people" in a vehicle. Corporal Ellis traveled toward Defendant's residence and located Ms. King laying on the ground alongside Grassy Knob Road. Corporal Ellis spoke with Ms. King about the evening's events and said she was afraid and "visibly upset." Ms. King led Corporal Ellis to Defendant's residence because Corporal Ellis had information that Defendant was possibly holding Ms. Harkless against her will. Corporal Ellis arrested Defendant, whom Corporal Ellis said became belligerent after being arrested.

Corporal Ellis took Defendant back to where he originally found Ms. King and began to complete an incident report, to photograph Ms. King's injuries, and to take statements from Ms. King and Ms. Harkless. Corporal Ellis also said Defendant became irate in the back of his patrol vehicle and hit his head against the car's windows. Corporal Ellis said Ms. King had "lots of red marks on her chest and around her neck area, . . . visible nicks or cuts to the top of her throat" and several bruises. Corporal Ellis also observed blood on Ms. King's shirt.

Officer Tyler Greene ("Officer Greene") was with Corporal Ellis on the evening at issue in this case. Officer Greene recounted similar statements as Corporal Ellis. Officer Greene said he observed cuts on Ms. King's neck and chin, but that they were difficult to see in the photograph presented at trial.

Detective McKinney testified at trial. Detective McKinney interviewed Ms. King, Ms. Harkless, and Ms. Moore two days after the events in question at the sheriff's office on 29 August 2011. Mr. Hamilton did not provide a statement at that time. Forensics Investigator Bruce Green testified that Ms. King brought a shirt to the sheriff's office on 31 August 2011, which Mr. Green identified as a shirt with blood staining.

The State rested its case and Defendant made a motion to dismiss. The trial court granted Defendant's motion with respect to all charges involving Ms. Harkless (11 CRS 52830) and Ms. Moore (11 CRS 52831). The trial court also dismissed the kidnapping charge involving Ms. King in 11 CRS 52829, but denied the motion as relating to the remaining charges. Defendant did not present any evidence. The jury found Defendant guilty of violating the DVPO with a deadly weapon in 11 CRS 52801, but not guilty of the remaining offenses. Defendant then entered a guilty plea to Habitual Felon status and was sentenced in the

aggravated range for a Class C felony as a prior record level VI. Defendant was sentenced to an active term of 168 to 211 months. Defendant filed written notice of appeal on 16 April 2013.

## II. Jurisdiction & Standard of Review

Defendant appeals pursuant to N.C. Gen. Stat. §§ 7A-27(b), 15A-1444(a) (2013). However, Defendant did not timely file his notice of appeal in violation of N.C. R. App. P. 4. Failure to comply with Rule 4 constitutes a jurisdictional default, which "precludes the appellate court from acting in any manner other than to dismiss the appeal." *Dogwood Dev. & Mgmt. Co. v. White Oak Transp. Co.*, 362 N.C. 191, 197, 657 S.E.2d 361, 365 (2008). Accordingly, we dismiss Defendant's appeal, but, in our discretion, we allow Defendant's petition for writ of certiorari to review the merits of his arguments pursuant to N.C. R. App. P. 21.

On appeal, Defendant argues that the trial court erred in refusing to instruct the jury on a lesser-included misdemeanor offense of violating a DVPO when it instructed the jury on violating a DVPO with a deadly weapon. Defendant did not object to the jury instruction at issue here, meaning that it was not preserved for appeal. However, "[i]n criminal cases, an issue

that was not preserved by objection noted at trial and that is not deemed preserved by rule or law without any such action nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error." N.C. R. App. P. 10(a)(4); *see also State v. Goss*, 361 N.C. 610, 622, 651 S.E.2d 867, 875 (2007).

"To establish plain error, defendant must show that the erroneous jury instruction was a fundamental error—that the error had a probable impact on the jury verdict." *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012). "Under the plain error rule, defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result." *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993).

## III. Analysis

We hold that because the trial court concluded that the knife used in this case was not a deadly weapon *per se*, the trial court should have instructed the jury on the lesser-included misdemeanor offense of violating a DVPO. We also hold that failing to instruct the jury on the lesser included

misdemeanor offense was plain error because it likely affected the outcome in this case.

In *State v. Weaver*, our Supreme Court adopted a definitional test for determining whether one crime is a lesser included offense of another crime. 306 N.C. 629, 635, 295 S.E.2d 375, 378-79 (1982), *disapproved of on other grounds by State v. Collins*, 334 N.C. 54, 431 S.E.2d 188 (1993). That test requires that

> all of the essential elements of the lesser crime must also be essential elements included in the greater crime. If the lesser crime has an essential element which is not completely covered by the greater crime, it is not a lesser included offense. The determination is made on a *definitional*, not a factual basis.

*Id.* at 535, 295 S.E.2d at 379.

Under the definitional test, the misdemeanor crime of violating a DVPO[1] is a lesser included offense of the felony crime of violating a DVPO with a deadly weapon.[2] Both crimes have identical elements of (i) knowingly (ii) violating a (iii) valid DVPO, except that the felony offense includes an additional element that the perpetrator be in "possession of a deadly weapon on or about his or her person or within close

---

[1] N.C. Gen. Stat. § 50B-4.1(a) (2013).
[2] N.C. Gen. Stat. § 50B-4.1(g) (2013).

proximity to his or her person." *Compare* N.C. Gen. Stat. § 50B-4.1(a) *with* N.C. Gen. Stat. § 50B-4.1(g). The felony offense also explicitly references the misdemeanor offense. N.C. Gen. Stat. § 50B-4.1(g) ("Unless covered under some other provision of law providing greater punishment, any person who, while in possession of a deadly weapon on or about his or her person or within close proximity to his or her person, knowingly violates a valid protective order as provided in subsection (a) of this section by failing to stay away from a place, or a person, as so directed under the terms of the order, shall be guilty of a Class H felony.").

As the misdemeanor violation of a DVPO is a lesser included offense of the felony violation of a DVPO, Defendant was also entitled to a jury instruction on that charge "'if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater.'" *State v. Tillery*, 186 N.C. App. 447, 450, 651 S.E.2d 291, 294 (2007) (quoting *Keeble v. United States*, 412 U.S. 205, 208 (1973)). The dispositive factor is the presence of evidence to support a conviction of the lesser-included offense. *Id.* As such, we must determine whether the jury could have rationally found that the knife used by the Defendant did not constitute a deadly weapon and also

whether there is evidence to support a conviction of misdemeanor violation of a DVPO.

In North Carolina, a "deadly weapon is one which, under the circumstances of its use, is likely to cause death or great bodily harm." *State v. Walker*, 204 N.C. App. 431, 444, 694 S.E.2d 484, 493 (2010). Generally, a weapon is determined to be "deadly" depending on its use and its characteristics. However, North Carolina courts have found some weapons to constitute deadly weapons *per se*. "Some weapons are *per se* deadly, e.g. a rifle or pistol: others, owing to the great and furious violence and manner of use, become deadly." *State v. Cauley*, 244 N.C. 701, 707, 94 S.E.2d 915, 920 (1956). This Court has found that knives are not always dangerous weapons *per se* and that the circumstances of each case are determinative. *See State v. Smallwood*, 78 N.C. App. 365, 368, 337 S.E.2d 143, 144–45 (1985).

In this case, the trial court concluded that the knife used by the Defendant was not a deadly weapon *per se*, as evidenced by the trial court's decision not to instruct the jury that the weapon used by the Defendant was deadly as a matter of law. The trial court instructed the jury that in order to find the Defendant guilty of violating a DVPO while in possession of a deadly weapon, the jury must "consider the nature of the knife,

the manner in which it was used, and the size and strength of the defendant as compared to the victim." The record also shows conflicting evidence as to whether or not the knife used by the Defendant on the victim was capable of producing death or great bodily harm. For example, Mr. Hamilton stated that the knife was so dull that even though Defendant was "sawing" Ms. King's neck with the pocket knife, Ms. King was left with only "knicks" on her neck. However, the jury may also consider the nature of the knife's use, the size of the knife, and the strength of the party when determining whether the knife is a deadly weapon. *State v. Palmer*, 293 N.C. 633, 643, 239 S.E.2d 406, 413 (1977) ("If there is a conflict in the evidence regarding either the nature of the weapon or the manner of its use, with some of the evidence tending to show that the weapon used or as used would not likely produce death or great bodily harm and other evidence tending to show the contrary, the jury must, of course, resolve the conflict."). Therefore, the trial court correctly determined that the knife used by the Defendant in this case was not a deadly weapon *per se*, and properly left this determination to the jury.

Having instructed the jury to determine whether the knife used in this case constituted a deadly weapon, the trial court

should have next instructed the jury on the lesser-included misdemeanor offense. This Court was presented with a similar issue in *Tillery*.

In *Tillery*, the Defendant used a 2x4 board in the course of an assault. 186 N.C. App. at 447, 651 S.E.2d at 292. The trial court instructed the jury on the offense of assault with a deadly weapon inflicting serious injury, but refused to instruct on the lesser-included offense of misdemeanor assault inflicting serious injury. *Id.* at 448, 651 S.E.2d at 293. On appeal, the Defendant argued that the trial court erred in refusing to instruct on the lesser-included misdemeanor. *Id.* at 449, 651 S.E.2d at 293. This Court agreed, holding that because the trial court did not find the 2x4 board to be a deadly weapon *per se*, the trial judge should have instructed the jury on the lesser-included offense of misdemeanor assault inflicting serious injury. *Id.* at 451, 651 S.E.2d at 294; *see also State v. Lowe*, 150 N.C. App. 682, 686, 564 S.E.2d 313, 316 (2002) (finding plain error for the trial court's failure to instruct the jury on the lesser-included misdemeanor assault charge, when "[t]here is sufficient evidence from which the jury could find that the [weapons used] were not used as deadly weapons").

Here, as in *Tillery*, the evidence presented at trial conflicted over whether the weapon used by the Defendant constituted a deadly weapon. In both cases, the only element that distinguished the felony offense from the misdemeanor offense was the Defendant's use of a deadly weapon in the course of the crime. We hold that, in this case, based on conflicting evidence of the knife's deadly qualities, a jury could have rationally found the Defendant guilty of the lesser-included offense of misdemeanor violation of a DVPO.

We must next consider whether the trial court's failure to instruct the jury on the lesser-included misdemeanor offense rose to the level of plain error. "In deciding whether a defect in the jury instruction constitutes plain error, the appellate court must examine the entire record and determine if the instructional error had a probable impact on the jury's finding of guilt." *State v. Odom*, 307 N.C. 655, 661, 300 S.E.2d 375, 378–79 (1983) (quotation marks and citation omitted).

Here, the State presented a strong case for the lesser-included violation of the DVPO. Defendant signed the DVPO. The timeframe for the DVPO was in effect at the time of the incident. The DVPO was filed on 18 May 2011, was effective until 18 May 2012, and the incidents at issue occurred on 27

August 2011, clearly within the time period of the DVPO. There was also extensive testimony that Defendant contacted and sought contact with Ms. King, which concerns whether he knowingly violated the DVPO.

At trial, Defendant was found guilty of violating the DVPO with a deadly weapon; all other charges were dismissed or Defendant was found not guilty by the jury. The jury returned a not guilty verdict for two charges that included an element of a deadly weapon, including assault with a deadly weapon under N.C. Gen. Stat. § 14-32(b) (2013). It is unclear whether the jury considered the knife a "deadly weapon" as to that charge, or whether the jury did not consider the injuries Ms. King sustained to be "serious" under § 14-32. However, the record shows there was extensive testimony about bruising, cuts, and other injuries to Ms. King, as well as testimony that Defendant's knife was very dull. Whether the jury did or did not believe the knife was a deadly weapon, however, there was not a sentencing option to find Defendant guilty solely of violating the DVPO. With the elements of the misdemeanor DVPO violation likely met, the jury's only method to sentence Defendant for violating the DVPO was through the felony violation of a DVPO with a deadly weapon. The lack of the

misdemeanor sentencing option, in light of the jury's finding that Defendant was not guilty of assault with a deadly weapon or AWDWIK, likely impacted the jury's finding of guilt on the felony charge. Accordingly, the trial court's failure to instruct on the misdemeanor of violating the DVPO rose to the level of plain error. As such, we remand this matter for a new trial. In light of our decision, we decline to address Defendant's remaining assignments of error.

## IV. Conclusion

For the reasons stated above, we order a

NEW TRIAL.

Judge STROUD concurs.

Judge DILLON dissents in a separate opinion.

STATE OF NORTH CAROLINA

   v.                         Rutherford County
                                   No. 11 CRS 52801
                                   12 CRS 1594

HOWARD JUNIOR EDGERTON


DILLON, Judge, dissenting.

I do not agree with the majority that any error by the trial court in failing to instruct the jury on the lesser-included misdemeanor domestic violence protective order ("DVPO") violation rose to the level of plain error; and, therefore, I respectfully dissent.

A person who knowingly violates a DVPO commits a misdemeanor, *see* N.C. Gen. Stat. § 50B-4.1(a) (2013); unless the person who violates the DVPO does so "while in the possession of a deadly weapon on or about his or her person or within close proximity to his or her person[,]" in which case that person is guilty of a felony. N.C. Gen. Stat. § 50B-4.1(g). As the majority correctly points out, the question is whether any error by the trial court in failing to instruct the jury on the lesser misdemeanor DVPO in the present case rose to

the level of plain error; that is, whether the jury **probably** would have convicted Defendant of misdemeanor DVPO, thereby concluding that the State had failed to prove that the knife was a "deadly weapon." *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012).

The pocketknife, which Defendant brandished in the victim's face and about her neck while choking her and threatening to kill her, had a blade which was described at trial as a "little duller than average." I certainly believe it is *possible* that the jury could have determined that the knife was not a deadly weapon, and would have, therefore, convicted Defendant of only a misdemeanor DVPO violation had it been instructed on this lesser-included offense. However, I also believe that the evidence was sufficient to sustain the finding that the knife was, indeed, a deadly weapon. Accordingly, I cannot say that the jury "probably" would have convicted Defendant of a misdemeanor DVPO if given that option.

The majority argues that the failure to instruct on a misdemeanor DVPO violation had a "probable impact" because the jury's verdict to convict on the felony DVPO violation was inconsistent with their decision to acquit Defendant of assault with a deadly weapon and AWDWIK, crimes which require a finding

that Defendant possessed a deadly weapon. In explaining inconsistent verdicts, our Supreme Court has stated as follows:

> [Inconsistent verdicts] should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, probably reached its conclusion on [one offense], and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the [other offense].
>
> . . . .
>
> Inconsistent verdicts therefore present a situation where "error," in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored. Given the uncertainty, and the fact that the Government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course.

*State v. Mumford*, 364 N.C. 394, 399-400, 699 S.E.2d 911, 915 (2010) (*quoting United States v. Powell*, 469 U.S. 57, 83 L. Ed. 2d 461 (1984)). Therefore, following our Supreme Court's rationale in *Mumford*, I cannot say that, in the present case, it is **probable** the jury would have acquitted Defendant of a felony DVPO violation based on its acquittal of the assault charges. It is "equally possible" that the jury was convinced of Defendant's guilt of the Chapter 50B charge, but that it reached an inconsistent verdict on the Chapter 14 assault charges –

assuming that the verdicts were, indeed, inconsistent[3] – through "mistake, compromise or lenity[.]" *Id.*

---

[3]   It is possible that the jury's verdicts were *not* inconsistent. Specifically, whether a weapon is deadly in the context of the Chapter 14 assault crimes for which Defendant was acquitted might depend on the "circumstances of [the weapon's] use," *State v. Lowe*, 150 N.C. App. 682, 686, 564 S.E.2d 313, 316 (2002), whereas the Chapter 50B felony for which Defendant was convicted does not require that the defendant "use" the weapon at all, but only that he *possessed* it when he violated the DVPO. Accordingly, the jury may have determined that the knife was a deadly weapon, but that he did not use it in a manner which was likely to cause death.