IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-109

No. 393PA20

Filed 4 November 2022

IN THE MATTER OF L.N.H.

Appeal pursuant to N.C.G.S. § 7A-31 from a unanimous, unpublished decision of the Court of Appeals, 272 N.C. App. 695, 2020 WL 4462550 (2020), reversing in part, vacating in part, and remanding the trial court's order entered on 23 August 2019 by Judge Marcus A. Shields in District Court, Guilford County. Heard in the Supreme Court on 23 May 2022 in session in the Old Burke County Courthouse in the City of Morganton pursuant to N.C.G.S. § 7A-10(a).

*Mercedes O. Chut, for appellant Guilford County Department of Health and Human Services.*

*Matthew D. Wunsche, for appellant Guardian ad Litem.*

*Jeffrey L. Miller, for appellant respondent-mother.*

BERGER, Justice.

¶ 1      Appellant Guilford County Department of Health and Human Services (DSS) appeals from a decision of the Court of Appeals which reversed in part and vacated in part the trial court's adjudications of abuse, neglect, and dependency, as well as the disposition and permanency planning order in the matter of L.N.H. *In re L.N.H.*, 272 N.C. App. 695, 2020 WL 4462550 (2020) (unpublished). DSS filed a petition for discretionary review on September 8, 2020. Respondent-mother filed a conditional

petition for discretionary review on September 28, 2020. We allowed both petitions on December 14, 2021.

## I. Factual and Procedural Background

Lea[1] was born in February 2019. On May 7, 2019, DSS began an investigation after receiving a report regarding Lea's hospitalization. The report alleged that respondent-mother punched Lea in the chest, sprayed a green liquid on Lea, waved a lighter near Lea's face, and burned Lea's feet with a lighter. The report also alleged that Lea was subsequently left outside on the porch unattended. Respondent-mother was arrested and charged with felony child abuse inflicting serious injury and held in the Guilford County Jail under a $500,000.00 bond. Medical records obtained by DSS from the hospital confirmed that Lea suffered burns to her feet.

Social worker Jerin Elliot interviewed respondent-mother in jail on May 8, 2019. Consistent with her statement to another social worker on the day of the incident, respondent-mother told Elliott that she did not remember the events leading to Lea's hospitalization; she only remembered that she had put the child to bed, drank alcohol, and then went to sleep. Respondent-mother admitted she suffered from depression and had not been taking her medication. She further identified Bruce Rutledge as Lea's father, but she did not have his contact information. Elliott's

---

[1] Pseudonyms are used in this opinion to protect the juvenile's identity and for ease of reading.

investigation further revealed that respondent-mother told her mother that when Lea was taken to the hospital for treatment, respondent-mother thought the child was still in the home.

¶ 4     On May 8, 2019, Lea's maternal great-grandmother and other family members informed DSS that they would be willing to take care of Lea; however, no home study had been completed when the petition was filed. Lea's family members also identified respondent-father as the child's father and stated that he had been in and out of prison and had active warrants against him.[2]

¶ 5     On May 9, 2019, DSS obtained nonsecure custody of Lea after filing a petition alleging that Lea was abused, neglected, and dependent.

¶ 6     On July 31, 2019, the trial court held an adjudication, disposition, and permanency planning hearing. At the hearing, Elliot testified about the investigation. When asked if DSS had received a report regarding the family, respondent-mother objected to testimony concerning the report on hearsay grounds. DSS argued the report was not being offered for the truth of the allegations set forth in the report, but to show why DSS became involved with the family. The trial court overruled the objection and allowed Elliot to testify.

---

[2] Respondent-father was subsequently located and served. He submitted to DNA testing which confirmed that he was Lea's biological father. However, at the time the petition was filed, paternity had not been established. The trial court ordered that reunification efforts with respondent-father should continue and that he should have visitation with the child.

¶ 7 Later, Elliot testified that DSS had received medical records regarding Lea's injuries. The trial court took judicial notice of a medical records exhibit, which the court had admitted in a previous nonsecure custody hearing without objection.[3] The medical records detailed how Lea was transferred to the hospital. The summary stated, "[Lea] is a 2 month old female . . . who was transferred from [a different] hospital where she was initially brought . . . by [Lea's] neighbors who witnessed [respondent-]mother abusing [Lea] physically." The medical records further contained a History of Present Illness section, which stated, "the neighbors saw [respondent-]mother burning [Lea]'s feet with [a] cigarette light[er], punching her in the abdomen and spraying her face with Windex."

¶ 8 On August 23, 2019, the trial court adjudicated Lea an abused, neglected, and dependent juvenile. The trial court found that Lea had sustained injuries related to respondent-mother "punching [her] in the chest, allowing green liquid to be placed across [her] face, and allowing [her] to sustain serious burns to her feet, as [a result of respondent-] mother being under the influence of alcohol, based upon her own admission." The trial court also determined that Lea was left outside on the steps of the home after sustaining these injuries.

¶ 9 The trial court ordered that legal and physical custody remain with DSS, but

---

[3] At oral argument, respondent-mother's counsel conceded that respondent-mother was represented by counsel at the hearing in which these medical records were originally admitted.

that custody be transferred to Lea's relatives once they complied with certain requirements. The court also found that reunification with respondent-mother would be unsuccessful and ordered DSS to cease reunification efforts with her. Respondent-mother's visitation rights with Lea were terminated.

¶ 10          Respondent-mother appealed. On August 4, 2020, the Court of Appeals held that respondent-mother was denied a fair hearing and the trial court erred in adjudicating Lea an abused, neglected, and dependent juvenile. *In re L.N.H.*, 272 N.C. App. 695, 2020 WL 4462550, at *6. Specifically, the Court of Appeals determined that respondent-mother's counsel provided ineffective assistance by failing to object to the admission of Lea's medical records and that the trial court improperly considered Elliot's testimony regarding the neighbors' report as substantive evidence. *Id.* at *5–6. Further, the Court of Appeals reversed the adjudication of dependency, stating that "the trial court erroneously based its adjudication of dependency on conditions existing at the time the petition was filed instead of the time of the adjudication." *Id.* at *7. As a result, the Court of Appeals vacated the disposition and permanency planning order and remanded the case to the trial court. *Id.*

¶ 11          On September 8, 2020, DSS filed a petition for discretionary review under N.C.G.S. § 7A-31(c). On September 28, 2020, respondent-mother filed a conditional petition for discretionary review in response. This court allowed both petitions on December 14, 2021, and the matter was heard on May 23, 2022.

## II. Analysis

First, we address the argument by DSS that the Court of Appeals erred in determining that the trial court improperly admitted and considered witness reports of abuse contained in Lea's medical records.

"In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(a)(1) (2021); *see also, In re E.D.*, 372 N.C. 111, 116, 827 S.E.2d 450, 454 (2019). As this Court has stated, "a respondent's failure to object to the trial court's taking judicial notice of underlying juvenile case files waives appellate review of the issue." *In re A.C.*, 378 N.C. 377, 2021-NCSC-91, ¶ 17 (cleaned up).

Here, the trial court took judicial notice of the medical records previously admitted without objection at a May 10, 2019 hearing on nonsecure custody in which respondent-mother was represented by counsel. When counsel for DSS offered the medical records for admission there, the following exchange occurred:

> [DEPARTMENT COUNSEL]: Your Honor, I'm not going to introduce an extensive amount of medical records; however, previously admitted into evidence on May 10th, 2019, are a portion of the medical records. Since those have already been admitted into evidence, I would ask at this time that you take judicial notice of those.
>
> THE COURT: Any objection?

> UNIDENTIFIED SPEAKER: No objection, Your Honor.
>
> [RESPONDENT-MOTHER'S COUNSEL]: No objection, already in evidence.
>
> THE COURT: All right. So admitted. The Court will take judicial notice.

The medical records included reports that Lea had been brought to the hospital by her neighbors after the neighbors witnessed respondent-mother burn Lea's feet with a cigarette lighter, punch Lea in the abdomen, and spray Lea in the face with Windex. Elliot also provided testimony regarding the reports that respondent-mother burned Lea's feet and left her on the porch. As this Court stated in *In re A.C.*, the failure to object to the trial court taking judicial notice of such records waives appellate review of the issue. *Id.* Thus, respondent-mother's failure to object waives appellate review.

DSS next argues that the Court of Appeals erred in determining that respondent-mother received ineffective assistance when counsel did not object to admission of the medical records.

A party alleging ineffective assistance of counsel "must show that counsel's performance was deficient and the deficiency was so serious as to deprive [the party] of a fair hearing." *In re B.B.*, 381 N.C. 343, 2022-NCSC-67, ¶ 39 (quoting *In re G.G.M.*, 337 N.C. 29, 2021-NCSC-25, ¶ 35). In order to show deprivation of a fair hearing, the party "must prove that there is a reasonable probability that, but for counsel's errors,

there would have been a different result in the proceedings." *Id*. (emphasis omitted). "[I]f a reviewing court can determine at the outset that there is no reasonable probability that in the absence of counsel's alleged errors the result of the proceeding would have been different, then the court need not determine whether counsel's performance was actually deficient." *State v. Braswell*, 312 N.C. 553, 563, 324 S.E.2d 241, 249 (1985).

¶ 18        There is "a strong presumption that counsel's conduct falls within the range of reasonable professional assistance." *State v. Roache*, 358 N.C. 243, 280, 595 S.E.2d 381, 406 (2004) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). "Counsel is given wide latitude in matters of strategy, and the burden to show that counsel's performance fell short of the required standard is a heavy one for [a party] to bear." *State v. Fletcher*, 354 N.C. 455, 482, 555 S.E.2d 534, 551 (2001)*; see also State v. Goss*, 361 N.C. 610, 623, 651 S.E.2d 867, 875 (2007) ("This Court indulges the presumption that trial counsel's representation is within the boundaries of acceptable professional conduct, giving counsel wide latitude in matters of strategy." (cleaned up)).

¶ 19        Here, counsel for respondent-mother objected to admission of Elliot's testimony regarding the report to DSS about Lea's injuries. The trial court overruled the objection and allowed Elliot's testimony. Elliot testified:

> A report was received alleging that on May 7th, 2019, [Lea], who at the time was reported as an unidentified child

weighing 11 pounds, was transported to the emergency
room after being assaulted by [respondent-mother].
[Respondent-mother] was observed punching the minor
child in the chest area. [Respondent-mother] spray[ed]
unknown green liquid in [Lea]'s face, then pulled out a
lighter and swiped the flame of the lighter across [Lea]'s
face. [Respondent-mother] was seen burning [Lea]'s feet
with the lighter. [Respondent-mother] then laid [Lea] on
the steps of the porch. [Lea] was then taken from
[respondent-]mother by observers, and law enforcement
was called.

¶ 20    Subsequently, DSS requested the trial court to take judicial notice of Lea's

medical records and stated that the medical records were "previously admitted into

evidence on May 10, 2019." Counsel for respondent-mother was asked if there was

any objection to the court taking judicial notice and responded, "[n]o objection,

already in evidence."

¶ 21    These medical records contained the same information about the source of

Lea's injuries as testified to by Elliot:

[Lea] is a 2 month old female . . . who was . . . initially
brought . . . by [Lea]'s neighbor who witnessed [respondent-
]mother abusing [Lea] physically. Per report, [respondent-
]mother was burning [Lea]'s feet with [a] cigarette
light[er], punching her in the abdomen and spraying her
face with Windex. She has <1% TBSA partial thickness
burns to the soles of her feet.

¶ 22    The record reflects that respondent-mother's counsel stated that he expressed

no objection to the trial court's decision to take judicial notice of the relevant medical

records and that he declined to exercise his right to object because those records were

"already in evidence." Thus, in this case, unlike in many other cases, the record contains an explanation for the failure of respondent-mother's counsel to lodge the objection that respondent-mother now claims should have been made. In addition, we note that neither this Court nor the Court of Appeals has directly addressed the issue of whether a trial court is entitled to judicially notice evidence that has previously been admitted into evidence at a hearing held for the purpose of determining whether a juvenile should continue in non-secure custody at a subsequent adjudication hearing, with reasonable arguments in support of and in opposition to the admissibility of this evidence having been advanced in the parties' briefs before this Court. For that set of circumstances, we are unable to conclude that respondent-mother's counsel's conduct was "unreasonable" given "prevailing professional norms." *Strickland*, 466 U.S. at 688. As a result, we hold that respondent-mother's ineffective assistance of counsel claim lacks merit.

¶ 23    DSS next contends that the Court of Appeals erred in reversing the trial court's adjudication of dependency because the trial court did not consider post-petition evidence.

¶ 24    "The adjudicatory hearing shall be a judicial process designed to adjudicate the existence or nonexistence of any of the conditions alleged in a petition." N.C.G.S. § 7B-802 (2021).

> Unlike in the dispositional stage, where the trial court's
> primary consideration is the best interest of the child and

> any evidence which is competent and relevant to a showing
> of the best interest of that child must be heard and
> considered by the trial court, evidence in the adjudicatory
> hearing is limited to a determination of the items alleged
> in the petition.

*In re A.B.*, 179 N.C. App. 605, 609, 635 S.E.2d 11, 14 (2006) (cleaned up). Thus, the conditions underlying determination of whether a juvenile is an abused, neglected, or dependent juvenile are fixed at the time of the filing of the petition. This inquiry focuses on the status of the child at the time the petition is filed, not the post-petition actions of a party.

¶ 25 Here, the Court of Appeals held that "[t]he trial court erroneously based its adjudication of dependency on conditions existing at the time the petition was filed instead of the time of the adjudication." *In re L.N.H.*, at *7. The Court of Appeals determined that the trial court erred in adjudicating Lea as dependent because "the trial court failed to make specific findings with respect to Lea's father's ability to provide or arrange care for her," and because respondent-mother's family members presented themselves as placement alternatives. *Id*. at *7.

¶ 26 This holding does not follow the plain language of N.C.G.S. § 7B-802. At the time the petition was filed, respondent-father's whereabouts were unknown and paternity had not been established. Further, there were no alternative placements available for Lea because home studies had not been completed. Thus, although relatives had been identified as potential alternative placements at the time the

petition was filed, no acceptable relative placements were available.

¶ 27        The trial court correctly found that, at the time the petition was filed, "[respondent-]mother did not provide any other alternative[] placements with family members who presented themselves to the department, [and respondent-]mother was unable to provide any information as it related to [respondent-father], who at the time, his location was unknown and the means to communicate with him remained unknown."

¶ 28        For these reasons, the trial court did not err in adjudicating Lea a dependent juvenile.

¶ 29        Finally, respondent-mother contends that the trial court erred by eliminating reunification efforts as an initial disposition following adjudication. At the time of the hearing in this case, N.C.G.S. § 7B-906.2(b) provided that

> [a]t any permanency planning hearing, the court shall adopt concurrent permanent plans and shall identify the primary plan and secondary plan. Reunification shall remain a primary or secondary plan *unless* the court made written findings under [N.C.G.S. §] 7B-901(c) or makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety.

(emphasis added). In this case, the trial court ordered DSS to cease reunification efforts with respondent-mother as part of the initial dispositional hearing. As a result, the trial court was required to make written findings under N.C.G.S. § 7B-901(c) before eliminating reunification as a primary or secondary plan. *See In re J.M.*,

255 N.C. App. 483, 499, 804 S.E.2d 830, 840–41 (2017) (holding, that "because the trial court ceased reunification efforts in an order entered following an initial disposition hearing, N.C.G.S. § 7B-901(c) was necessarily implicated."), *disc. rev. improvidently allowed*, 371 N.C. 132, 813 S.E.2d 847 (2018).

¶ 30      At the time of the hearing in this case, N.C.G.S. § 7B-901(c) provided that

> [i]f the disposition order places a juvenile in the custody of a county department of social services, the court shall direct that reasonable efforts for reunification as defined in [N.C.G.S. §] 7B-101 shall not be required if the court makes written findings of fact pertaining to any of the following, unless the court concludes that there is compelling evidence warranting continued reunification efforts:
>
> (1) A court of competent jurisdiction determines or has determined that aggravated circumstances exist because the parent has committed or encouraged the commission of, or allowed the continuation of, any of the following upon the juvenile:
>
>> a.  Sexual abuse.
>>
>> b.  Chronic physical or emotional abuse.
>>
>> c.  Torture.
>>
>> d.  Abandonment.
>>
>> e.  Chronic or toxic exposure to alcohol or controlled substances that causes impairment of or addiction in the juvenile.
>>
>> f.  Any other act, practice, or conduct that increased the enormity or added to the injurious consequences of the abuse or neglect.

(2) A court of competent jurisdiction terminates or has terminated involuntarily the parental rights of the parent to another child of the parent.

(3) A court of competent jurisdiction determines or has determined that (i) the parent has committed murder or voluntary manslaughter of another child of the parent; (ii) has aided, abetted, attempted, conspired, or solicited to commit murder or voluntary manslaughter of the child or another child of the parent; (iii) has committed a felony assault resulting in serious bodily injury to the child or another child of the parent; (iv) has committed sexual abuse against the child or another child of the parent; or (v) has been required to register as a sex offender on any government-administered registry.

Thus, before eliminating reunification efforts with respondent-mother, the trial court in this case was required to make written findings pertaining to one of the circumstances listed above. *See J.M.*, 255 N.C. App. at 500, 804 S.E.2d at 841.

¶ 31    In its order, the trial court found that "[r]eunification efforts with the mother would be clearly unsuccessful and inconsistent with the juvenile['s] health and safety" and that "[t]here are aggravating circumstances that exist as it relates to the mother and juvenile, whereas the mother's conduct caused serious injuries to the juvenile." Although the trial court did not specifically cite N.C.G.S. § 7B-901(c), its reference to "aggravating circumstances" is sufficient to invoke that statutory provision. *See In re A.P.W.*, 378 N.C. 405, 2021-NCSC-93, ¶ 20 (noting that "[t]he trial court's written findings must address the statute's concerns but need not quote its exact language") (quoting *In re L.M.T.*, 367 N.C. 165, 168, 752 S.E.2d 453, 455 (2013)). Thus, the

question before this Court on review is

> limited to whether there is competent evidence in the record to support the findings of fact and whether the findings of fact support the conclusions of law. The trial court's findings of fact are conclusive on appeal if supported by any competent evidence. Uncontested findings are binding on appeal. The trial court's dispositional choices— including the decision to eliminate reunification from the permanent plan—are reviewed for abuse of discretion. An abuse of discretion occurs when the trial court's ruling is so arbitrary that it could not have been the result of a reasoned decision.

*Id.*, ¶ 14–15 (cleaned up). Given that respondent-mother has challenged the sufficiency of the evidence to support the trial court's finding of aggravated circumstances under N.C.G.S. § 7B-901(c), we review those findings to determine if they were supported by competent evidence. *See In re B.C.T.*, 265 N.C. App. 176, 186–87, 828 S.E.2d 50, 57 (2019).

As an initial matter, the trial court's mere declaration that "there are aggravating circumstances that exist," without explaining what those circumstances are, is not sufficient to constitute a valid finding for purposes of N.C.G.S. § 7B-901(c). *Cf., In re A.W.*, 377 N.C. 238, 2021-NSCS-44, ¶ 31–32 (holding that there was sufficient evidence to support the trial court's finding that the parent's conduct with respect to the juvenile "increase[d] the enormity and add[ed] to the consequences of the neglect of [the juvenile] where the parents had "consistently worked together to conceal" the abuse and neglect that had led to the death of the juvenile's sister given

that "there is no means by which [the trial court] can address what caused the death

of [the sister] and thereby [e]nsure the safety of [the juvenile]"). Although the trial

court noted that "[respondent-]mother's misconduct caused serious injuries to the

juvenile," the evidence presented in this case cannot support a finding of any of the

aggravated circumstances listed in N.C.G.S. § 7B-901(c)(1)a–e.

¶ 33        In apparent recognition of this fact, DSS relies on N.C.G.S. § 7B-901(c)(1)f,

which permits the trial court to cease reunification efforts if it makes written findings

of "[a]ny other act, practice, or conduct" on the part of the respondent-parent "that

increased the enormity or added to the injurious consequences of the abuse or

neglect." DSS contends that the trial court's findings show that Lea sustained severe

burns on the soles of her feet while in respondent-mother's care, that respondent-

mother recalled drinking alcohol before Lea was injured while lacking any memory

of hurting Lea, that Lea was left alone on the front porch of respondent-mother's

house, and that Lea's injuries were severe enough to require hospitalization for two

days and continued medical treatment for several weeks thereafter, so that

"[respondent-mother's] conduct and actions toward Lea on 7 May 2019 'increased the

enormity' and 'added to the injurious consequences' of evidence supporting the court's

adjudications of abuse and neglect within the meaning of [N.C.G.S. §] 7B-901(c)(1)f."

¶ 34        The fundamental defect in DSS's argument is that it relies upon evidence

necessary to support the trial court's adjudication of abuse and neglect to show the

existence of conduct that exacerbated the consequences of that abuse and neglect. In other words, although DSS argues that respondent-mother's conduct in burning Lea's feet and leaving her on the porch increased the enormity and added to the injurious consequences of burning Lea's feet and leaving her on the porch, N.C.G.S. § 7B-901(c)(1)f requires a showing of the existence of "any *other* act, practice, or conduct," which seems to us to require that the evidence in aggravation involve something in addition to the facts that rise to the initial adjudication of abuse and/or neglect. *See A.W.*, ¶ 32; *see also In re C.L.K.*, 2022 WL 4841743, 2022-NCCOA-661, ¶ 14 (unpublished) (concluding that the trial court's extensive findings of fact demonstrated how the respondent-mother's conduct "increased the enormity or added to the injurious consequences of the abuse [and] neglect" of her children, with the trial court having found that the respondent-mother continued to allow her boyfriend to live in the house for months despite knowledge that he was sexually abusing one of her children and that respondent-mother was failing to provide appropriate care for her daughter despite awareness of her daughter's extensive medical needs). As a result, since the allegation that respondent-mother burned Lea's feet and left her on the porch cannot serve as conduct that "increase[d] the enormity" or "add[ed] to the injurious consequences" of that conduct, the evidence does not support a determination that any of the aggravating factors specified in N.C.G.S. § 7B-901(c)(1) exist in this case.

On the other hand, we do believe that there *is* sufficient evidence in the record to support a determination by the trial court that reunification efforts were not required pursuant to N.C.G.S. § 7B-901(c)(3)(iii), which allows the cessation of reunification efforts in an initial dispositional order in the event that the parent "has committed a felony assault resulting in serious bodily injury to the child[.]" As noted above, following the events that led to Lea's removal from respondent-mother's custody, respondent-mother was arrested and charged with felony child abuse inflicting serious injury. In our view, the record developed before the trial court contains ample evidence that tends, if believed, to show that respondent-mother's actions in burning Lea's feet involved the commission of a felonious assault upon the child that resulted in serious bodily injury. Although the trial court did not make the findings necessary to permit the cessation of reunification efforts with respondent-mother based upon N.C.G.S. § 7B-901(c)(3)(iii), it certainly could have done so had it chosen to make such a determination. As a result, we vacate that portion of the trial court's order ceasing reunification efforts with respondent-mother based on a finding the existence of aggravated circumstances and remand to the trial court with instructions to enter appropriate findings addressing the issue of whether efforts to reunify respondent-mother with Lea should be ceased pursuant to N.C.G.S. § 7B-901(c). *See In re L.R.L.B.*, 377 N.C. 311, 2021-NCSC-49, ¶ 38 (remanding to the trial court where it failed to make written findings as required by N.C.G.S. § 7B-

906.2(d)(3)).

## III.    Conclusion

For the foregoing reasons, we hold that the trial court did not err in adjudicating the child abused, neglected, and dependent, and did not err in eliminating reunification efforts with respondent-mother.  We also hold that respondent-mother's counsel provided effective assistance.  We reverse the decision of the Court of Appeals and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED.