IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-149

Filed 7 May 2025

Duplin County, Nos. 19CRS050740-300, 19CRS000218-300

STATE OF NORTH CAROLINA

v.

DEONTE D. MEADOWS

Appeal by defendant from judgment entered 28 March 2023 by Judge Douglas B. Sasser in Duplin County Superior Court. Heard in the Court of Appeals 15 January 2025.

> *Attorney General Jeff Jackson, by Special Deputy Attorney General Robert C. Ennis, for the State.*

> *Ryan Legal Services, PLLC, by John E. Ryan, III, for defendant.*

ARROWOOD, Judge.

Deonte D. Meadows ("defendant") appeals from judgment entered 28 March 2023 upon his convictions of possession of a firearm by a felon and first-degree murder. On appeal, defendant argues: (1) defendant's counsel was per se ineffective by conceding guilt without permission and (2) the trial court erred by failing to intervene *ex mero motu* when the State made improper closing arguments. For the following reasons, we vacate defendant's convictions and remand for a new trial.

## I.    Background

The evidence at trial tended to show the following:

At around 12:41 am on 8 July 2016, Duplin County Sheriff's Deputy Evan Brock ("Deputy Brock"),[1] along with Sergeant Kennedy and Corporal Turner, responded to a call from Dondi Hutcherson Sr.  ("Mr. Hutcherson Sr."),  reporting a break-in and a gunshot injury to his son.  Upon arriving to the scene, Deputy Brock noticed that there was forced entry at the front door of the home.  Inside the home, Deputy Brock found different sized bullet casings on the floor in the living room.  When the officers proceeded further into the home, they found Dondi Hutcherson, Jr. ("the victim") lying face down on the floor, and determined that he was deceased.

Mr. Hutcherson Sr. informed Deputy Brock that when he arrived home that evening, he saw a pair of shoes in the road and noticed the front door to his home was open.  Upon walking to the front door, he noticed it had been kicked in and saw bullets on the floor.  When he walked into the home, he saw his son lying face down on the floor with blood around him.

Defendant was indicted on charges of murder and possession of a firearm by a felon on 28 May 2019.  Neither indictment mentioned any other actors or suspects and only discussed the actions of defendant.

---

[1] At the time of trial, Brock was an officer with the North Carolina State Highway Patrol as a highway patrolman in Duplin County, and the transcript reflects his status as an Officer.  However, because he was a deputy with the Duplin County Sheriff's Office at the time of the incident, we refer to him accordingly in the opinion.

Prior to trial, defendant filed a motion to dismiss the charge of first-degree murder, arguing that law enforcement officers "failed to properly secure and process the crime scene." Furthermore, defendant argued that law enforcement officers failed to preserve evidence that could have tested and may have exonerated defendant. After a hearing on the motion to dismiss, the trial court ultimately ruled that there was no indication that evidence had been disturbed or tampered with and denied the motion to dismiss.

The trial commenced on 13 March 2023. During trial, the trial court heard a motion in limine related to potential gang involvement by the defendant. The trial court ultimately held that evidence of the defendant's gang involvement was admissible to establish motive, intent, planning, preparation, and the identity of the perpetrator.

Leslie Daugherty, a forensic scientist at the North Carolina State Crime Laboratory, testified as to the physical evidence that was found at the scene of the crime. She testified that she could not match the imprints of shoes that were found on the front door, which had been forcibly entered, to the shoes found outside the home.

Thus, much of the State's case rested on testimony given by defendant's former partner, Nalja Burton ("Ms. Burton"). During trial, Ms. Burton, who had previously dated and lived with defendant at the time of the incident, testified that the shoes found at the crime scene were loaned to defendant by his former roommate. Ms.

Burton further testified that defendant had been in a gang known as Eight Trey Crips along with two men who were known to Ms. Burton as "Ducc" and "Chapo."

Ms. Burton testified that on the night of the incident, defendant had received a call from his gang brothers "to handle some business." She had given defendant the shoes that were found at the scene of the crime prior to defendant leaving their home with Ducc and Chapo. When defendant, Ducc, and Chapo returned to Ms. Burton's apartment, she observed them pacing and sweating. She testified that they came back with "a whole bunch of money and a lot of weed" and they proceeded to divide both the money and the weed between the three of them. She indicated that another member of the gang, nicknamed "Dehigh," was responsible for ordering Chapo, Ducc, and defendant to pursue the victim, and "was the one that paid them." According to Ms. Burton, Dehigh and Ducc had a higher position in the gang than defendant and Chapo. Ms. Burton also noted that defendant was not wearing shoes when he returned to their home. According to Ms. Burton, when defendant arrived back to their home on the evening of 7 July 2016, he admitted to her that he had killed the victim and that he "moved up in the gang."

The State only brought charges against defendant and did not bring charges against Ducc and Chapo, who Ms. Burton had testified had been present at the scene of the incident that night. In addition to Ms. Burton's testimony, the State also played for the jury several phone calls between Ms. Burton and defendant, which the State argued corroborated Ms. Burton's testimony that defendant was the shooter.

4

During trial, the court conducted a *Harbison* inquiry with defendant. The trial court specifically questioned defendant about the State eliciting testimony from witnesses regarding a prior felony conviction. The prior felony in question was a conviction of felony flee to elude arrest committed on 18 February 2014. The trial court confirmed that the defendant consented to a stipulation that he had previously been convicted of a felony. Beyond asking about this prior felony conviction, the trial court did not inquire about, and the defendant did not provide, consent to discuss any other stipulations or admissions of guilt.

Notably, prior to and during trial, defendant sought new counsel on three different occasions. First, pursuant to defendant's request, his trial counsel filed a motion to withdraw on 22 December 2022, which the trial court denied. Subsequently, on 9 January 2023, during pre-trial motions, defendant's counsel motioned for withdrawal stating that defendant had lost confidence in his ability to represent him. The trial court ultimately denied this motion. Finally, on 20 March 2023, defendant's counsel made an oral motion for withdrawal as defendant's counsel during the trial. Defendant's counsel stated that defendant was "not happy with [his] representation[,]" felt that counsel was "not representing vigorously enough or zealously enough," and that his "continued representation [was] not in his best interest." However, defendant's counsel stated that he had no ethical reasons why he could not continue to represent defendant. Accordingly, the trial court, after acknowledging that they had not observed any actions or lack thereof to

indicate that defendant's counsel was not fulfilling his ethical obligations in providing effective and zealous representation, denied the motion.

Following the close of evidence, the trial court conducted a charge conference to determine the appropriate jury instructions to provide. The parties specifically discussed whether to include an instruction about acting in concert. The trial court stated it would not provide an instruction to the jury about acting in concert and denied the State's request to include such instruction in the jury charge.

After the charge conference, the trial proceeded to closing arguments. The State presented its closing argument first, stating as follows:

> First, we told you during jury selection that you will hear evidence that the defendant was not the only person responsible for the murder of the victim, but he is the only person on trial in front of all of you. For you to fulfill your duty, you have to decide this defendant's guilt. You've all promised that you would not consider or be distracted by the fact that others were involved, because it is your duty to determine this defendant's guilt. And as we discussed during jury selection, as His Honor will instruct you with regard to the law on proximate cause, His Honor will tell you that the defendant's act may not have been the only cause nor the nearest cause. It is sufficient if it occurred with some other cause happening at the same time, which in combination would have caused the victim's death. Either acting by himself or with others, the defendant is absolutely guilty of murder.

The State later stated,

> Now, when you consider the evidence, the State doesn't have to prove that the defendant actually fired the shot that actually killed the victim. If he committed one act that contributed to the victim's death, he is just as guilty as

6

everybody else. But we know that he did more than one act, ladies and gentlemen. We know that he actually went in there with a loaded firearm with the intent to commit murder and fired multiple shots at the victim, which resulted in his death.

The State proceeded to make arguments regarding acting in concert, ignoring the trial court's denial of the request for an instruction and without any objection by the defendant's counsel:

> [T]he State must prove the defendant's acts were the proximate cause of the victim's death. We talked about this earlier. A proximate cause is a real cause, a cause without which the victim's death would not have occurred. Of course, shooting at a human being is a proximate cause. But he doesn't have to actually cause the fatal shot. If he did something, acting himself or help with others, to cause the proximate death of the victim, he is guilty of first-degree murder.

Following the State's closing arguments and a brief recess, counsel for defendant presented his closing arguments. Defendant's counsel made several comments throughout his closing arguments related to defendant and the possibility of his guilt. Specifically, defendant's counsel stated,

> We have discovered other things about Deonte. Deonte is a soldier. He's at the bottom of the totem pole. When I say a soldier, Ducc is the top guy. He's the guy with authority over a lot of people. Chapo is below Ducc, and Deonte is the guy at the bottom, under Chapo. Of course, under Ducc. He's like a soldier. Higher-ups, sergeants, officers tell a soldier to go and do this and that. That's a soldier's job, not to question orders. Go do it. Deonte is the guy at the bottom, like a soldier.
>
> What else have we discovered about Deonte and how it

7

happened, about Deonte? The call came the night of the incident, and the call is like, "Hey, dude, we've got a job. Do you want to -- do you want to come join us on the venture?" He was not given an option. The bossman and the sub-bossman show up in a, probably, muscle truck, pick him up. Deonte could not say, "Well, I'm interested," "I'm not interested." When the bossman shows up, hey, got to go. You have no choice in the matter. Deonte had no choice in the matter. They came, they picked him up. We have no idea whether he went voluntarily, whether he went grudgingly. What we do know is he had no choice.

Defendant's counsel went on to state:

We have no idea what went on, because -- I told you -- I promised you at the beginning, the fact that there was no eyewitness, there is no video, there is no photo, will cause problems for the State. We circle back. We are right here. We have no idea what happened. We don't know what -- is it Ducc who kicked the door down? Is it Deonte? We have no clue. We don't know who was holding up a .45 caliber weapon. I don't know who was holding a 9-millimeter weapon. We don't even know how -- in fact, how many people went inside the residence. . . . Maybe all three of them were there. Maybe you might -- you might reasonably conclude that all three of them were there, but, again, we have no idea -- we really don't have any idea what happened. Again, we don't -- we don't know whether all three of them were there. We don't know which one was holding which firearm. We don't know who fired that fatal shot. We have no clue. That's the State's burden they did not --they failed to meet.

However, later in his oral arguments, defendant's counsel admitted defendant was at

the scene of the crime:

What is the point? It shows at least one of the shooters, terrified, don't know what he's doing, necessary or unnecessary, just firing, because he was in a state of panic, under high stress. Doesn't want to be there. Evidence

8

doesn't show anything about Deonte's state of mind, but what we do know is he went there under the orders of these higher-ups. I submit to you that it is reasonable to suppose he was only concerned about himself, only concerned about carrying out orders of his higher-ups. He had no intent whatsoever. He was supposed to act the way -- he was trying to act the way he was supposed to under these circumstances.

But we know a little bit more about -- if you are to believe the State's evidence -- if you were to draw the State's evidence, it he was, indeed, Deonte; it was indeed Deonte who left one shoe or two shoes on the roadway; we also know a little bit more. He's terrified. Ms. Morton took pains to explain to you there was only one person in the house, unarmed. They know he was there. But how does, allegedly, Deonte act? Terrified. It's like Jurassic Park. Dinos are coming. He's running, shoe falls off. He's in such a hurry, he doesn't even have the time to put the shoe back on, if you were to believe that's what happened, based on the State's evidence.

After closing arguments, the trial court gave jury instructions which did not include any acting in concert instruction. The jury deliberated and returned a guilty verdict on the charge of first-degree murder. Defendant filed oral notice of appeal on 28 March 2023 in open court.

## II.    Discussion

On appeal, defendant argues: (1) counsel for defendant was per se ineffective by conceding guilt without permission and (2) the trial court erred by failing to intervene *ex mero motu* in the State's improper closing arguments. Because we find a *Harbison* violation, we need not address the second argument.

### A. *Harbison* violation

9

Defendant contends that his counsel was per se ineffective by conceding guilt without first receiving permission from defendant. Specifically, defendant argues that his counsel impliedly admitted defendant's guilt when he stated during closing arguments that defendant went to the home of the victim with Ducc and Chapo on the night of the incident. Based upon the facts in this case, we agree.

Under the Sixth and Fourteenth Amendments of the United States Constitution, a "defendant's right to counsel includes the right to the effective assistance of counsel." *State v. Braswell*, 312 N.C. 553, 561 (1985) (citing *McMann v. Richardson,* 397 U.S. 759, 771 (1970)). Generally, in order to establish a claim for ineffective assistance of counsel, "the defendant must show that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

In some cases, there exist "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *State v. Harbison*, 315 N.C. 175, 179 (1985). One such circumstance is:

> When counsel admits his client's guilt without first obtaining the client's consent, the client's rights to a fair trial and to put the State to the burden of proof are completely swept away. The practical effect is the same as if counsel had entered a plea of guilty without the client's consent.

*Id.* at 180. Thus, a "per se in violation of the Sixth Amendment[] has been established in every criminal case[] in which the defendant's counsel admits the defendant's guilt

to the jury without the defendant's consent." *Id.*

In *State v. McAllister*, our Supreme Court held that "[a]lthough an overt admission of the defendant's guilt by counsel is the clearest type of *Harbison* error, it is not the exclusive manner in which a per se violation of the defendant's right to effective assistance of counsel can occur." 375 N.C. 455, 475 (2020). Rather, "[i]n cases where . . . defense counsel's statements to the jury cannot logically be interpreted as anything other than an implied concession of guilt to a charged offense, *Harbison* error exists unless the defendant has previously consented to such a trial strategy." *Id.*

Regarding consent, "an on-the-record exchange between the trial court and the defendant is the preferred method of determining whether the defendant knowingly and voluntarily consented to an admission of guilt during closing argument," but our Courts have also "declined to define such a colloquy as the sole measurement of consent." *Id.* at 477 (citations and quotation marks omitted). Additionally, "the absence of any indication in the record of defendant's consent to his counsel's admissions will not—by itself—lead us to 'presume defendant's lack of consent.' " *Id.* (citations omitted). Following a conclusion that a defendant's trial counsel violated *Harbison* by making an admission of guilt without defendant's consent, the proper course is to reverse and remand for a new trial. *Id.* at 464.

In this case, defendant maintained his innocence throughout trial and during the only *Harbison* inquiry at trial, gave his counsel consent to discuss *only* his

previous conviction of felony fleeing to evade arrest. There is no evidence in the record to suggest that at any other point before or during trial defendant's counsel sought or obtained informed consent from defendant to discuss his presence at the crime scene or his involvement with the gang the evening of the incident. Accordingly, the record reflects that defendant gave consent to discuss his previous conviction, but not his presence at the crime scene, which coupled with the fact that defendant maintained his innocence throughout trial leads us to the conclusion that defendant did not knowingly or voluntarily consent to an admission that he was present at the crime scene during closing argument.

However, there were several instances where both the State and defendant's counsel erred in presenting their closing arguments. During the State's closing argument, the prosecutor stated:

> And as we discussed during jury selection, as His Honor will instruct you with regard to the law on proximate cause, His Honor will tell you that the defendant's act may not have been the only cause nor the nearest cause. It is sufficient if it occurred with some other cause happening at the same time, which in combination would have caused the victim's death. *Either acting by himself or with others, the defendant is absolutely guilty of murder.* (emphasis added)
> . . . .
> A proximate cause is a real cause, a cause without which the victim's death would not have occurred. Of course, shooting at a human being is a proximate cause. But he doesn't have to actually cause the fatal shot. *If he did something, acting himself or help with others, to cause the proximate death of the victim, he is guilty of first-degree murder.* (emphasis added)

12

However, at the charge conference, the trial judge had *specifically decided not to provide a jury instruction on acting in concert* because only defendant was named in the indictment and there was no other mention of anyone else acting with him or even being present at the scene of the crime. The trial judge expressed concern with the instruction opening up a situation that was not in accordance with the indictment. The State did not bring charges against Ducc or Chapo and defendant was the only person being charged with first-degree murder out of all the individuals allegedly present at the scene of the incident.

Essentially, the State disregarded the trial court's ruling at the charge conference that acting in concert was not an appropriate method to prove defendant's guilt, and on two separate occasions argued a portion of the rejected acting in concert instruction alongside the trial court's proposed proximate cause instruction. In direct contravention of the court's ruling the State argued that because defendant was present at the scene of the crime with Ducc and Chapo, he could be found guilty of first-degree murder, based upon a theory of acting in concert.

Defendant's trial counsel, in addition to failing to object to this improper argument, made several statements during his closing argument that amounted to an implied admission of guilt on this theory. First, defendant's counsel admitted that defendant went with Ducc and Chapo to defendant's home when he stated,

> We have discovered other things about Deonte. Deonte is a
> soldier. He's at the bottom of the totem pole. When I say a

13

> soldier, Ducc is the top guy. He's the guy with authority over a lot of people. Chapo is below Ducc, and Deonte is the guy at the bottom, under Chapo. Of course, under Ducc. He's like a soldier. Higher-ups, sergeants, officers tell a soldier to go and do this and that. That's a soldier's job, not to question orders. Go do it. Deonte is the guy at the bottom, like a soldier.
>
> What else have we discovered about Deonte and how it happened, about Deonte? The call came the night of the incident, and the call is like, "Hey, dude, we've got a job. Do you want to -- do you want to come join us on the venture?" He was not given an option. The bossman and the sub-bossman show up in a, probably, muscle truck, pick him up. Deonte could not say, "Well, I'm interested," "I'm not interested." When the bossman shows up, hey, got to go. You have no choice in the matter. Deonte had no choice in the matter. They came, they picked him up. We have no idea whether he went voluntarily, whether he went grudgingly. What we do know is he had no choice.

Defendant's counsel clearly stated to the jury that defendant did indeed go with Ducc and Chapo to the victim's house, albeit apparently under duress. His counsel further stated, "[e]vidence doesn't show anything about Deonte's state of mind, but what we do know is he went there under the orders of these higher-ups. I submit to you that it is reasonable to suppose he was only concerned about himself, only concerned about carrying out orders of his higher-ups."

These statements, coupled with the State's closing arguments that directed the jury to find guilt if defendant was acting with the other two perpetrators, imply guilt. Defense counsel's statements could not be interpreted as anything other than an implied admission of guilt when the State specifically told the jury that defendant is

14

guilty if he was present at the scene of the incident. This is particularly problematic where there was limited physical evidence tying defendant to the scene.

In *State v. McAllister*, defense counsel conceded that defendant, who had been charged with the crime of assault against a female, had gotten physical with the victim. *See id.* at 472. Specifically, defense counsel stated, "[y]ou heard him admit that things got physical. You heard him admit that he did wrong, God knows he did. They got in some sort of scuffle or a tussle or whatever they want to call it, she got hurt, he felt bad, and he expressed that to detectives." *Id.* at 460. Although defense counsel later asked the jury to find defendant not guilty for the other three crimes defendant had been charged with, he never mentioned anything about finding defendant not guilty for assault against a female. Because defense counsel admitted that the defendant had gotten physical with the victim, our Supreme Court noted this statement reminded the jury that defendant admitted that defendant had "did wrong" to the victim.

The statements made by defendant's counsel in this case are analogous. Here, defendant's counsel admitted that defendant, although he had no choice, followed orders from other gang members who were in a higher position than defendant and conceded that defendant went along with them to the victim's house. Defendant's counsel effectively confirmed Ms. Burton's testimony when she discussed the call defendant had received from Ducc and Chapo on the night of the incident. This amounts to an implied admission that although defendant was following orders, he

15

was also a participant in the crime in question.

While recognizing the *McAllister* Court's admonition "that a finding of *Harbison* error based on an implied concession of guilt should be a rare occurrence[,]" *McAllister,* 375 N.C. at 376, we believe defendant's counsel's statements in this case present such a rare occurrence. Accordingly, defendant's counsel committed a per se *Harbison* violation in violation of defendant's Sixth and Fourteenth Amendment right to effective counsel by making an implied admission of guilt without defendant's consent. We arrest judgment and remand for a new trial.

### B.    Intervention *Ex Mero Motu*

The remaining issue on appeal is whether the trial court erred in not intervening *ex mero motu* during the State's closing arguments when the State instructed the jury that they may find guilt from defendant's mere presence at the scene of the incident. However, arresting the judgment from the trial court and ordering a new trial moots the need for us to address that contention.

### III.    Conclusion

For the foregoing reasons, we vacate judgment and remand this matter to the trial court for a new trial.

JUDGMENT VACATED; REMANDED FOR NEW TRIAL.

Judge COLLINS concurs.

Judge STADING dissents by separate opinion.

STADING, Judge, dissenting, writing separately.

I would hold that Defendant's trial counsel did not render ineffective assistance of counsel because he did not impliedly admit Defendant's guilt. However, even if trial counsel had made such admission, since the cold record is silent as to whether Defendant knowingly and voluntarily consented to any implied admission of guilt, Defendant's appeal should be dismissed without prejudice. *See State v. House*, 340 N.C. 187, 196, 456 S.E.2d 292, 297 (1995); *see also State v. McAllister*, 375 N.C. 455, 477, 847 S.E.2d 711, 725 (2020). Additionally, I would hold that the trial court did not err by declining to intervene *ex mero motu* during the State's closing argument.

## I.   Implied Admission of Guilt

### A. *Harbison* Error

If trial counsel "admits the defendant's guilt to the jury without the defendant's consent[,]" such act amounts to a "per se" violation of the defendant's Sixth Amendment right to counsel. *State v. Harbison*, 315 N.C. 175, 180, 337 S.E.2d 504, 507–08 (1985). "Although an overt admission of the defendant's guilt by counsel is the clearest type of *Harbison* error, it is not the exclusive manner in which a per se violation of the defendant's right to effective assistance of counsel can occur." *McAllister*, 375 N.C. at 475, 847 S.E.2d at 723. A *Harbison* error could also occur if "defense counsel's statements cannot be logically interpreted as anything other than an implied concession of guilt to a charged offense . . . unless the defendant has previously consented to such a trial strategy." *Id.* The circumstances under which

our Court determines the existence of "a *Harbison* error based on an implied concession of guilt should be a rare occurrence." *Id.* at 476, 847 S.E.2d at 724.

Our Supreme Court has stated "that an on-the-record exchange between the trial court and the defendant is the preferred method of determining whether the defendant knowingly and voluntarily consented to an admission of guilt during closing argument"; yet, it has "declined to define such a colloquy as the sole measurement of consent." *Id.* at 477, 847 S.E.2d at 724 (citation omitted). Moreover, "the absence of any indication in the record of defendant's consent to his counsel's admissions will not—by itself—lead us to 'presume defendant's lack of consent.'" *Id.* at 477, 847 S.E.2d at 725 (citation omitted).

Here, Defendant contends that his trial counsel's closing argument impliedly admitted Defendant's guilt by conceding Defendant was present at the victim's house with two others implicated in the crimes. Even so, this admission does not qualify as an admission of guilt. *See State v. Wiley*, 355 N.C. 592, 620, 565 S.E.2d 22, 42 (2002) ("Admitting a fact is not equivalent to an admission of guilt."). With respect to the offenses Defendant faced at trial, his trial counsel recalled the State's factual points for the jury before discounting them. In doing so, trial counsel consistently made qualifying statements such as "I'm not admitting to anything," "I'm not saying anything they said happened," and "If you were to believe the State's evidence . . . ."

After recalling these factual points, Defendant's trial counsel then discussed the elements required to sustain a conviction as well as the requisite burden of proof:

2

I told you from the beginning, what the State is asking you to do is send the young man over there to prison to spend the rest of his natural life, and the State's burden, by law, is strict and high. This is one of those they have done nothing to satisfy. We have no idea what went on, because -- I told you -- I promised you at the beginning, the fact that there was no eyewitness, there is no video, there is no photo, will cause problems for the State. We circle back. We are right here. We have no idea what happened. We don't know what -- is it Ducc who kicked the door down? Is it [Defendant]? We have no clue. We don't know who was holding up a .45 caliber weapon. I don't know who was holding a 9-millimeter weapon. We don't even know how -- in fact, how many people went inside the residence. . . . How did Chapo's bandanna end up inside the residence? What . . . did Najla Burton really know about what happened? Based on that -- I'm asking you, because nobody knows -- is it reasonable to conclude that -- there are twice as many 9-millimeter shell casings as .45 caliber and Chapo's bandanna was inside the residence. Maybe all three of them were there. Maybe you might -- you might reasonably conclude that all three of them were there, but, again, we have no idea -- we really don't have any idea what happened. Again, we don't -- we don't know whether all three of them were there. We don't know which one was holding which firearm. We don't know who fired that fatal shot. We have no clue. That's the State's burden they did not -- they failed to meet. . . . It's the State's burden to prove who fired that shot, or to prove that shot caused -- in conjunction with some other shot, caused the death. Nothing of that sort has been brought forth.

A holistic view of trial counsel's closing shows that he raised the State's factual contentions to argue it failed to prove Defendant's guilt beyond a reasonable doubt. *See State v. Goss*, 361 N.C. 610, 626, 651 S.E.2d 867, 877 (2007) (citation omitted) ("Statements or remarks in closing argument 'must be viewed in context and in light of the overall factual circumstances to which they refer.'"); *see also State v. Jackson*,

292 N.C. App. 616, 626, 899 S.E.2d 34, 42 (2024) ("[I]n viewing the entirety of defense counsel's statements in context, we hold those statements cannot logically be interpreted as an implied concession of Defendant's guilt."). Defense counsel's statements thus do not amount to an implied admission of guilt. Furthermore, coupling the State's closing argument with Defendant's trial counsel's argument to reach a determination of ineffective assistance stretches beyond the four corners of *Harbison*, 315 N.C. 175, 337 S.E.2d 504, and *McAllister*, 375 N.C. 455, 477, 847 S.E.2d 711. I lament that the majority's result expands the current boundaries of precedent.

**B. Defendant's Consent**

Even assuming trial counsel's statements violated *Harbison*, the cold record does not reveal whether Defendant knowingly and voluntarily consented to these admissions. As in *State v. House*, we "will not presume from a silent record that defense counsel argued defendant's guilt without defendant's consent." 340 N.C. at 196, 456 S.E.2d at 297. Rather, "[i]n this situation the appropriate remedy, if any, is for a defendant to file, either before or after direct appeal, a motion for appropriate relief in the superior court based upon ineffective assistance of counsel." *Id.* at 196–97, 456 S.E.2d at 297.

Such result is consistent with the ruling in *State v. McAllister*. 375 N.C. 455, 847 S.E.2d 711. In *McAllister*, our Supreme Court determined that "defense counsel's statements . . . amounted to an implied admission of defendant's guilt of the crime of

4

assault on a female." *Id.* at 473, 847 S.E.2d at 722. Since the cold record was silent, the Court remanded the matter "for an evidentiary hearing to be held as soon as practicable for the sole purpose of determining whether defendant knowingly consented in advance to his attorney's admission of guilt to the assault on a female charge." *Id.* at 477, 847 S.E.2d at 725. Accordingly, even if defense counsel's concession could be construed as an implied admission of guilt, the appropriate remedy in this scenario is to dismiss Defendant's appeal without prejudice so that he may file a motion for appropriate relief with the Superior Court.

## II. The State's Closing Argument

Trial courts have a duty, "upon objection, to censor remarks not warranted by either the evidence or the law, or remarks calculated to mislead or prejudice the jury. If the impropriety is gross it is proper for the court even in the absence of objection to correct the abuse *ex mero motu*." *State v. Sanderson*, 336 N.C. 1, 15, 442 S.E.2d 33, 42 (1994) (citations and quotation marks omitted). "To establish such an abuse, [the] defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *State v. Ward*, 354 N.C. 231, 250, 555 S.E.2d 251, 264 (2001) (citation and quotation marks omitted). "[T]he comments must be viewed in the context in which they were made and in light of the overall factual circumstances to which they referred." *State v. Call*, 349 N.C. 382, 420, 508 S.E.2d 496, 519 (1998).

Defendant maintains his trial was fundamentally unfair and the trial court should have intervened, without prompting, as the State "injected its own acting-in-concert instructions and stamped [the trial court's] imprimatur upon it":

> The question you-all have to ask yourselves during deliberations is how do you know that the defendant was the one that committed murder. First, we told you during jury selection that you will hear evidence that the defendant was not the only person responsible for the murder of the victim, but he is the only person on trial in front of all of you. For you to fulfill your duty, you have to decide this defendant's guilt. You've all promised that you would not consider or be distracted by the fact that others were involved, because it is your duty to determine this defendant's guilt. And as we discussed during jury selection, as His Honor will instruct you with regard to the law on proximate cause, His honor will tell you that the defendant's act may not have been the only cause nor the nearest cause. It is sufficient if it occurred with some other cause happening at the same time, which in combination would have caused the victim's death. Either acting by himself or with others, the defendant is absolutely guilty of murder.
> . . . .
> Now when you consider the evidence, the State doesn't have to prove that the defendant actually fired the shot that actually killed the victim. If he committed one act that contributed to the victim's death, he is just as guilty as everybody else.
> . . . .
> But he doesn't have to actually cause the fatal shot. If he did something, acting himself or help with others, to cause the proximate death of the victim, he is guilty of first-degree murder.

This argument did not amount to gross impropriety. *See State v. Frye*, 341 N.C. 470, 491, 461 S.E.2d 664, 674 (1995) (The prosecutor's arguments summarizing

6

aggravating and mitigating circumstances "were not grossly improper and did not require the trial court to intervene *ex mero motu*" since they "were substantially correct, even if slightly slanted toward the State's perspective."). Moreover, this claimed error of law, "whispered into the ear of the jury" by the prosecution, was cured by the trial court's correct jury instructions following closing arguments. *See State v. Barden*, 356 N.C. 316, 366, 572 S.E.2d 108, 140 (2002) ("The statements made by the prosecutor, while not technically correct, were not so misleading that the trial court erred by failing to intervene *ex mero motu*. Most important, any misstatements of law by the prosecutor were cured by proper instructions given by the trial court when it charged the jury."). When discussing proximate cause, the State referenced "others were involved," but the trial court correctly instructed the jury, thus curing any alleged defect within the State's closing argument. *See State v. Messick*, 159 N.C. App. 232, 237, 585 S.E.2d 392, 395 (2003) (holding the trial court did not err by giving the following proximate cause instruction to the jury: "The defendant's act need not have been the last cause or the nearest cause. It is sufficient if it occurred with some other cause acting at the same time, which in combination with it, proximately caused the death of (name victim)."). The trial court did not abuse its discretion by failing to intervene *ex mero motu.*